TEXAS & ST. L. RY. Co., in Missouri and Arkansas, *v.* RUST and another.

*(Circuit Court, E. D. Arkansas.* October Term, 1883.)

1. CONTRACT—STIPULATED DAMAGES FOR FAILURE TO PERFORM.

A provision in a contract to build a railroad bridge that, in case of non-completion of the bridge or providing a crossing for trains by a given date, the sum of $1,000 per week should be deducted from the contract price of the bridge for the time its completion or provision for crossing trains is delayed beyond that date, is a stipulation for liquidated damages.

2. SAME—DELAY—GOOD FAITH.

In such case, if the contractors act in good faith, and the delay results from causes beyond their control, they will not be liable for damages in excess of the stipulated amount.

3. SAME—ASSUMING RISKS—EXCUSE.

The fact that the contractors were retarded in the work by high water, sickness of hands, and sunken logs encountered in sinking piers, does not excuse them from performance of their contract. They assumed these risks when they executed the contract, without a provision exempting them from the consequences of such casualties.

4. SAME—CONSTRUCTION OF CONTRACT—PROVINCE OF COURT AND JURY.

It is the duty of the court to determine the construction of a contract. But where it has relation to a trade, profession, or business of a technical character, and is expressed in terms of art, or in words having a technical or peculiar sense in such trade, profession, or business, resort must be had to the testimony of experts, or those acquainted with the particular art or business to which the words relate: and when such testimony is conflicting, the question of the meaning of such terms and words must be referred to the jury.

5. SAME—WAIVER—SILENCE.

A waiver is not to be implied from the silence of one who is under no obligation to speak. The intention to waive a right must be established by language or conduct, and not by mere conjecture or speculation.

6. SAME—ADDITIONAL WORK—EXTENDING TIME.

If, after a contract is made for building a bridge by a given day, the owner of the bridge directs the contractor to make additions or changes, or do work on the bridge not covered by the contract, which will require longer time to complete the bridge, the time necessary to do such extra work must be added to the contract time allowed for the completion of the work.

At Law.

*John McClure, H. K. & N. T. White,* and *Phillips & Stewart,* for plaintiff.

*U. M. & G. B. Rose* and *M. L. Bell,* for defendants.

CALDWELL, J., *(charging jury.)* On the twenty-second day of April, 1882, the parties entered into a written contract for the construction, by the defendants for the plaintiff, of a railroad bridge across the Arkansas river, at the price of $305,000. Differences arose between them as to their relative rights, duties, and obligations under the contract, which resulted in the institution of this suit. The matters in controversy between them can best be brought to your attention by stating the defendant's claims first, which may be stated thus:

| | |
|---|---:|
| 1. Contract price for bridge, - - - - - | $305,000 00 |
| 2. For sinking piers, other than center pier, below 60 feet, at $200 per vertical foot, as per contract, - - - | 1,000 00 |
| 3. Extra for sinking center pier 10 feet below 60 feet, | 15,000 00 |
| 4. Extra for draw protection, - - - - - | 21,530 00 |
| 5. Extra for iron stringers, - - - - - - | 2,646 00 |
| 6. Extra for two shore abutments, - - - - | 1,600 00 |
| 7. Extra for additional material for piers sunk below 60 feet, | 1,900 00 |
| 8. Extra for trestle approaches, - - - - | 911 70 |
| | $349,587 70 |

Against this sum the defendants admit credits as follows:

| | |
|---|---:|
| 1. For reduced height of piers, - - - - | $   8,100 00 |
| 2. For material and labor to complete bridge after defendants quit work, - - - - - - - | 6,000 00 |
| 3. Payments on estimates, - - - - - | 267,959 79 |
| | $282,059 79 |

This makes the balance claimed by the defendants as due to them from the plaintiff $67,527.91. The parties agree as to the amount paid defendants on estimates, i. e., $267,959.79. The items in the defendants' accounts which the plaintiff disputes are, the charge for sinking center pier below 60 feet in excess of $200 per vertical foot; the whole of the charge for a draw protection; the whole of the charge for iron stringers for draw span; the whole of the charge for extra materials for piers sunk below 60 feet; and the charge for shore abutments is said to be excessive to the amount of $200.

The plaintiff's claims against the defendants may be stated thus:

| | |
|---|---:|
| 1. Payments made on estimates, - - - - | $267,959 79 |
| 2. Weekly reduction in price of bridge for its non-completion, 39 weeks and 4 days, at $1,000 per week, - - | 39,570 88 |
| 3. Claim for general damages for failure to complete bridge, - | 200,000 00 |
| 4. For money expended in completing bridge after defendants quit work, - - - - - - - | 15,075 61 |
| 5. Reduction in contract price of bridge on account of reduced height of piers, - . - - - - | 8,100 00 |

The defendants dispute the plaintiff's claim for damages, including the $1,000 per week specified in the contract, on the ground that plaintiff waived the same; they admit their liability for what it cost the plaintiff to complete the bridge after they quit work upon it, but they say the amount charged therefor above $6,000 is excessive. The provisions of the contract, and the law applicable to the matters in controversy between the parties, will now be stated in their order. The contract contains this provision:

"In case of non-completion of the bridge upon November 1, 1882, or providing a crossing for trains by said date, then in such event the sum of $1,000 per week for the period of time such completion or provision for crossing of trains is delayed shall be deducted from said contract price; and in like manner, should the bridge be completed at an earlier date than November 1, 1882, then in such event the sum of $1,000 per week shall be added to

said contract price, for the period by which said fixed date of completion shall be anticipated."

It is a conceded fact in the case that the bridge was not completed so trains could cross on it until the fourth day of August, 1883, and that no other mode of crossing trains was provided by the defendants before that time; and the plaintiff claims that, under the clause of the contract I have quoted, it is entitled to a reduction of $1,000 per week in the contract price of the bridge, from the first of November 1882, to the fourth day of August, 1883, when the bridge was so far completed as to admit of the passage of trains over it. It is open to parties when they make a contract to agree on the amount to be paid or allowed by either to the other as compensation for a breach of it. Sometimes stipulations providing for the payment of a fixed sum for a breach of contract are termed penalties, and go for nothing for reasons not necessary to be stated here. But where the damages for the breach of the contract are uncertain in their nature, or difficult to be proved with any degree of accuracy, and the amount fixed by the contract is not grossly in excess of a probably just compensation, that sum will be taken as the true amount of the damages, and is called in legal parlance liquidated damages.

The difficulty of ascertaining, with any degree of certainty, the damages the plaintiff sustained, is made apparent by the testimony of the witnesses in the case, who estimated the damages from half a million of dollars down to a comparatively small sum. You will observe the contract does not provide for the payment of a large sum in gross for a failure to have the bridge completed on the day named, or for any mere technical breach of the contract. If it had done so a different question would be presented. The damages fixed by the contract do not accrue for failure to complete the bridge on a given day, but for "non-completion of the bridge, or of providing a crossing for trains by said date," which latter alternative could have been complied with by providing a boat to transfer trains; and upon failure to do either, the damages are not given in one gross sum the day the default accrues, but are graduated according to the length of time the breach continues, and are not excessive or unreasonable in amount. You are therefore instructed that the contract fixed the amount of the defendants' liability for non-completion of the bridge, or failure to provide a crossing for trains by the first of November, 1882, and afterwards. That amount is $1,000 per week from that date until a crossing for trains was provided. As the defendants seem to have acted in good faith, and the delay resulted from causes beyond their control, the plaintiff will not be permitted to show the damages were more, nor the defendants that they were less, than the stipulated amount. Nor does the fact, if it is a fact, that the defendants were unexpectedly retarded in the work on the bridge by high water, sickness of hands, and sunken logs, encountered in sinking the piers, excuse them from performance of their contract, or from any of its

obligations. Against the consequences of such casualties they might have guarded by a provision in the contract. Not having done so, it is not in the power of the court or jury to relieve them. *Dermott* v. *Jones*, 2 Wall. 1.

The learned counsel for the plaintiff has argued that this clause of the contract relates to the price to be paid for the bridge, which it is said is made to depend on the time of its completion, and that the $1,000 per week is a "deduction from the contract price" of the bridge, and not damages for its non-completion. In construing a contract every part of it must be taken into consideration. It is perfectly obvious from the face of the contract, as well as from the correspondence which preceded its execution, that $305,000 was deemed by both parties a fair and just price for the bridge, and that the time fixed for its completion was thought to be reasonable. In view of these facts it is unreasonable to suppose that the parties deliberately agreed that the more time and money it took to build the bridge, beyond what the contract contemplated, the less price the contractors should receive for it by the amount of $1,000 per week; and that over and above the loss of this sum, which might absorb the price of the bridge and more too, they should be liable for all damages sustained by non-completion of the bridge for the same period this $1,000 per week was deducted. The contract does not mean this. The $1,000 per week is damages, and it is none the less so because it is to be "deducted from the contract price."

Witnesses were examined, without objection from either side, on the question of damages. On the case as it stands such evidence is irrelevant, and is excluded from your consideration. You will therefore reject *in toto* the plaintiff's claim of $200,000 for general damages.

The provisions of the contract bearing on the question whether the defendants are entitled to compensation above $200 per vertical foot, for sinking the center pier below 60 feet, are the following:

"A center pier consisting of wrought-iron cylinders, sunk to a depth of sixty feet below low water into the compact material of the bed of the river, making a total height of 100 feet from base of pier to bridge seat, the center column being seven feet in diameter, and the six outside columns four feet in diameter. * * * Seven intermediate piers consisting each of two wrought-iron cylinders, seven feet in diameter, sunk and filled in manner provided for center pier. * * * If, during the progress of sinking of piers, it shall be decided to found any of them at a less depth than said sixty feet below low water, then in such event the sum of $200 per vertical foot of pier for said reduced height shall be deducted from contract price, and in like manner should it be decided to sink to a depth below sixty feet, and not below seventy feet, then in that event there shall be added to the contract price said sum of $200 per vertical foot of pier."

The defendants' contention is that the word "piers" in the last of these clauses, in the understanding and usage of engineers and bridge builders, does not include the center, or draw pier. The evi-

dence shows that the difference in the cost of sinking the center and any other pier is as three and a half or four to one. It is the duty of the court to determine the construction of a contract, and this duty it is usually able to perform without the aid of a jury or extrinsic evidence. But it not unfrequently occurs that contracts have relation to a trade, profession, or branch of business of a technical character, and are expressed in terms of art, or in words having a technical or peculiar sense in such trade or business, with which the court is not familiar. In such cases resort must be had to the testimony of experts, or those acquainted with the particular art or business to which the words relate, and when such evidence is conflicting, as it is in this case, the question of the meaning of such terms and words in the contract must be referred to the jury.

It is under the operation of this rule that it becomes proper for the court to refer to you for decision these questions: (1) Whether the word "pier," as used in that clause of the contract providing for the sinking of "piers" below 60 feet, at the option of the plaintiff, does or does not include the center or draw pier; (2) whether a contract to construct "a 355 feet rectangular wrought-iron truss-draw" requires the main stringers for such draw-span to be constructed of iron; and (3) whether the contract to built the "bridge complete" included a draw protection?

You have heard the testimony of the engineers and bridge builders who where called as experts, and of the parties who made the contract, and from this evidence you will determine these questions. If you find the word "pier" in the clause referred to did not include the center or draw pier, and that the sinking of that pier below 60 feet was not provided for in the contract, then you will allow the defendants the reasonable value of their labor and materials used in sinking the center pier below the depth of 60 feet; and you will make a like allowance for the draw protection and iron stringers for the draw span, if you find they were not included in the original contract. One having no knowledge of the science of engineering or bridge building would construe the word "piers" in the clause of the contract under consideration to include all the piers in the bridge; and you will so construe it, unless it is shown by a preponderance of evidence that among engineers and bridge builders it has in the connection in which it is here used a particular or technical meaning which limits and restricts it to the piers which support the fixed spans.

In relation to the questions whether the "draw protection" and the "iron stringers" for the draw span are called for by the contract, I call your attention to this clause of the contract: "Plans, diagrams, and detailed specifications embodying the above stipulations, which shall meet the approval of the chief engineer, will be promptly furnished upon acceptance hereof."

The plaintiff claims that "plans, diagrams, and detailed specifications" were furnished by defendants under this clause of the contract and submitted to and approved by plaintiff's chief engineer, and that the detailed specifications thus submitted contained this provision: "The draw protection to consist of two timber cribs, 24 feet by 30 feet, as shown on drawings, sunk to bed of river, filled with oak piles driven to a firm bearing; the cribs to be carried up to level of ordinary high water and filled with rip-rap stone;" and that the plan and diagram furnished conformed to this specification and showed a draw protection. And the same specifications contain this provision: "The trusses of the draw to be built entirely of wrought-iron, floor beams and main stringers of iron.   *   *   *"   If you find the specifications submitted to and approved by the plaintiff's chief engineer, under the contract, contained the clauses I have quoted, then it is quite clear the defendants themselves understood the contract to include the draw protection, and that the "main stringers" of the draw span were to be "of iron."

Under the clause of the contract which I have quoted the "plans, diagrams, and specifications," when submitted to and approved by the chief engineer, became a part of the contract, and whatever is included in them is included in the contract; and if you find the specifications submitted by the defendants under the contract to the plaintiff's engineer and approved by him contained the provisions I have quoted then you can make no extra allowance to defendants for the "draw protection" or for "main iron stringers" for the draw span.

The defendants say the plans and specifications in evidence are not those originally furnished under the contract, but a copy subsequently made in which the draw protection and iron stringers are called for in pursuance to an agreement to furnish them as extras, made after the first plans were delivered. This is denied by the plaintiff, and you will settle this in common with all other disputed facts.

I now come to the claim of the defendants that the sum of $1,000 per week stipulated for in the contract for non-completion of the bridge was waived by mutual consent of the parties. If one in possession of a right conferred either by law or contract, knowing his rights and all the attendant facts, does or forbears to do something inconsistent with the existence of the right or of his intention to rely upon it, he is said to have waived it. No man is compelled to stand on a right which the law or his contract gives him. Parties have the same right to add to or vary a contract after it is made that they had to make it originally. The burden is on the party asserting a waiver or any modification or alteration of a contract to prove it. It is not necessary to show an express agreement for the waiver or modification; like any other fact, it may be proved by circumstances, such as the acts or language of the parties, which, of course,

includes their correspondence and any other facts which throw light on the question.

The right of the plaintiff under the contract to the $1,000 per week for the non-completion of the bridge is a valuable right of which it is not to be deprived without its consent, either expressed or implied. What inducement or consideration was there for the plaintiff to waive its right to all damages for non-completion of the bridge? It was the duty of the defendants, under the contract, to go forward and complete the bridge, and this was a continuing duty. They had no right to demand of the plaintiff a relinquishment of its right to damages as a condition of going forward with the work. The contract does not state when the $1,000 per week is to be deducted from the contract price, and the plaintiff was not bound to deduct it from the monthly estimates; and a failure, therefore, to make a claim for it, from month to month, is not sufficient evidence of a waiver. A waiver is not to be implied from the plaintiff's silence, because there was no obligation on the plaintiff to say anything on the subject. The intention to waive a right must be established by language or conduct, and not by mere conjecture or speculation. You will remember that it is not the province of courts and juries to make contracts for parties, or to alter them after they are made, but to enforce them as the parties made them. You should not, therefore, let any supposed considerations of hardship influence you to find a waiver upon insufficient or unsatisfactory testimony. It may be that $1,000 a week was more damages than plaintiff actually sustained for some weeks after the first of November, 1882, but, on the other hand, it is obvious that that sum is greatly less than the damages that accrued weekly after the completion of the road, which occurred some weeks before the bridge was completed. But there may have been a partial or limited waiver of this right, or rather an extension of the original contract time for completing the bridge, in a mode to which I will now call your attention.

If the plaintiff directed the defendants to make additions or changes, or do work on the bridge not covered by the contract, and which would require longer time to complete the bridge, and this fact was known to both parties, then it must be implied that both parties consented to such an extension of time as was necessary or reasonable for making such additions or changes, but no more. *Manuf'g Co.* v. *U. S.* 17 Wall. 592. If such orders for additions or changes in the bridge were given by the plaintiff, and the defendants, with good faith and with reasonable diligence and adequate force and appliances, performed such extra work, then the time required to do the same must be added to the contract time allowed for completion of the bridge; as, for instance, if you find additions and changes were made at plaintiff's request, and that the time necessary to make them was, say one week, then the time at which the $1,000 per week was to commence to accrue under the contract would be postponed one week. You are

the judges of the facts, the weight of evidence, and the credibility of witnesses.

The jury found a verdict of $2,489.97 for the plaintiff, which neither party sought to disturb.