**SANITARY FARM DAIRIES, Inc.**
**v. GAMMEL.**

No. 14252.

United States Court of Appeals,
Eighth Circuit.

**March 6, 1952.**

Rehearing Denied May 13, 1952.

108

Patrick J. Ryan, St. Paul, Minn., for appellant.

Mandt Torrison, St. Paul, Minn. (Gerhard Bundlie and Bundlie, Kelley, Finley & Maun, St. Paul, Minn., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

This is a suit by a stockholder against the corporation for specific performance of a contract to repurchase his common stock. The appeal is by the corporation from the amount fixed by the trial court as the value or price of the stock under the contract. The rights of the parties are governed by Minnesota law.

The contract, made in 1929, gave plaintiff an option, without limitation as to time, to resell to defendant the stock involved, "at a sum of money per share equal to twelve times the net earnings per share of said common stock for the preceding twelve months." Plaintiff waited until January, 1945, to exercise his option. During the preceding twelve months, the corporation had had a 28-percent increase in its dairy business, as the result of some army-camp contracts.

There was an auxiliary provision in the contract that "In the event of inability of the parties to agree upon earnings * * * for said preceding twelve months an audit shall be made by an independent auditor, the cost of which shall be borne by the parties equally, and the earnings determined by such audit shall be controlling." Plaintiff, after the exercise of his option, was unwilling to accept the determination of earnings made by the firm of accountants employed by defendant, and the parties therefore selected Ernst and Ernst, an accounting firm operating on a national scope, to make an audit for purposes of their contract.

A supplemental agreement was executed between plaintiff and defendant, as first and second party respectively, providing "that the firm of Ernst and Ernst * * * shall be retained and hired for the purpose of making an audit of all the books and records of the second party, or such part thereof as may be requested by either party, for the purpose of ascertaining and determining the net earnings per share of the common stock of the second party for the twelve (12) months of the calendar year 1944, * * * and that, when such audit has been made, it shall be controlling upon the net earnings per share of the second party for the year 1944 and that thereupon the agreement of June 6, 1929 shall be carried out by the parties."

Plaintiff submitted to Ernst and Ernst, pursuant to the privilege accorded each party under the supplemental agreement, a list of a number of items or entries to which he particularly wanted consideration given. He also attempted to insist that Ernst and

Ernst should treat the term "net earnings" in the repurchase agreement as meaning earnings before deduction of federal and state income taxes and not earnings after such deductions. There was a clause in the repurchase agreement that "In determining net earnings per share for any year it shall be considered that all of the earnings of the corporation for such year belong to the holders of the common stock except sufficient to take care of the current annual dividends on the preferred stock for such year." It was defendant's position that, under general accounting concept, as well as specifically on the language which the parties had used (the sufficiency of earnings "to take care of the current annual dividends on the preferred stock" not being capable of legal determination or natural significance without consideration of or provision for income taxes) the term "net earnings" in the situation necessarily meant earnings after deduction of taxes.

To escape having this question foreclosed to them as a matter of accountancy determination on the part of Ernst and Ernst, the parties orally agreed that it should be reserved and treated as a legal question for judicial resolution and that the way should be left open to them so to deal with it by having Ernst and Ernst make a determination of net earnings on the basis of both theories. This Ernst and Ernst did in the profit and loss statement contained in their audit report. Nothing else was reserved by the parties in relation to the auditing task or its result.

The audit of defendant's accounting firm had shown net earnings of $97,707.68 for the period involved—that determination having been made with income taxes deducted. Ernst and Ernst's determination arrived at earnings of $180,602.90 without deduction of income taxes and $104,349.12 with such deductions made. This result

was the product in part of their refusing to recognize as expense various items which defendant's accountants had so classified, and also of their making other adjustments on independent appraisal and judgment, which gave rise to some deductions not included in expense by defendant's accountants.

Plaintiff still was not satisfied and refused to accept Ernst and Ernst's determination as "controlling" and to proceed on the basis of it to a resolution of the legal question reserved. Instead, he instituted this plenary suit and asked the court to make a determination of the earnings of the corporation and the value of his stock, as an open accounting matter. He engaged some accountants of his own for purposes of the suit, and they thereafter supplied him with a report to the effect that his stock was entitled to be valued or priced on the basis of earnings of $220,739.23.

This figure in substantial measure, as the evidence showed, was the product of viewing corporate items and entries abstractly and without regard contextually to the corporation's regular mode of operating its business and to its established accounting policies. The setting of practice and system was treated by plaintiff's accountants as of slight, if any, moment, in the task of their immediate employment,[1] despite the part which that factor had played structurally and fiscally throughout the life of the corporation and during all of the time, from 1929 to 1944, that plaintiff had chosen to retain his stock, that he had been occupying the role of a director of the corporation, and that as a stockholder he had had the advantage of such benefits as currently accrued to the corporation from payment and acceptance of its income taxes on this basis. A few examples will suffice, we think, to indicate the nature of the disparity between the determination of earnings made

---

[1]. The position taken by plaintiff's accountants in the present audit was inconsistent with the approval which they had made of the corporation's accounting practices and of its treatment of such items as officers' withdrawals for travel and entertainment purposes without supporting vouchers, etc., when they had been employed by defendant to make an audit of its operations in 1940, and when they had certified that the corporation's balance sheets presented "fairly" the financial position of the corporation and were "in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year."

by plaintiff's accountants and that arrived at by Ernst and Ernst.

Thus, plaintiff's accountants abstractly classified as capital outlay a considerable number of items, many of which were of relatively small amount individually but aggregately quite substantial, solely because they regarded all of these items on their face as possessing a useful and contributive life in the business of more than a year. Ernst and Ernst, in more realistic, over-all perspective, had accepted the corporation's treatment as expense of most of these items. Some they so recognized on the basis of consistent corporate practice and resulting structural relationship, in conjunction with the tax authorities' previous allowance of the items as proper 1944 deductions. Other items similarly branded as capital outlay by plaintiff's accountants on mere invoice or entry inspection had been granted recognition by Ernst and Ernst as repair or replacement expenditures, after seeking information and receiving explanation from the officers of the corporation as to their nature and purpose (repeated by the officers on the witness stand) and with a viewing of the purported facts given them as properly justifying the corporation's treatment of the items.

Again, plaintiff's accountants rejected allowance of any of the cash withdrawals made by officers of the corporation through the course of the year for alleged travel and entertainment purposes, because no supporting vouchers or itemized statements had been filed covering the use of these funds.[2] Ernst and Ernst on the other hand had given recognition to the withdrawals as expense, in relation to the practical considerations that the corporation throughout its history, and during plaintiff's 15-year tenure as director, had never required its officers to make any such formal or detailed accounting of their travel and entertainment expenditures; that the officers stated —with repetition made on the witness stand —that the money had been used only for purposes of the business; that the records showed the amounts to be in line with those of previous years; and that the withdrawals had been allowed as business expenditures on the examination of records made by the income-tax authorities.

Other items disallowed by plaintiff's accountants and given recognition by Ernst and Ernst involved simply the question of whether they in fact had been purchases for the corporation or for the officers and their families personally. Plaintiff's accountants branded them as personal purchases on the invoices alone, from their general nature. Explanation made by the officers and repeated by them at the trial was warrantive of the corporation's payment of the items as business purchases.[3] The question as to these items therefore was at most a matter of reaching a proper judgment and conclusion in the auditing task on the evidentiary elements which were involved.

One additional item may perhaps even more specifically serve to demonstrate the basis of difference in the results arrived at by Ernst and Ernst and plaintiff's accountants. This involved the question of the value at which the corporation reasonably should have carried on its books for 1944 an inventory of milk bottles, whose use it had discontinued. Defendant, during 1944, for reasons prompted by war conditions, had changed from the use of round milk bottles to square ones, as other large dairies in the area had been doing also. After the

---

2. As referred to in footnote 1, supra, plaintiff's accountants in a previous audit had approved such items as not constituting improper corporate disbursement or improper accounting practice in the corporation's situation.

3. These purchases included such small items from a drug store as aspirin, tooth powder, vitamin pills, etc. One of the officers testified that these purchases had been made for use at the plant during a period when defendant was operating on a 24-hour basis and when it had been necessary for him to remain on hand at the plant all the time, taking his sleep and making his toilet there. The vitamin pills, he said, were placed in dispensers through the plant for employees' use. Other items presented similar factual questions, such as, for example, whether certain gasoline purchases had been made for the officers' personal enjoyment of a launch or in its use for customer promotional outings.

conversion, defendant had charged off as worthless inventory all the round bottles which it then had on hand. Its reasons for so doing, it said, were that it was not possible for it to tell at the time whether the bottles could at all be disposed of except for crushed salvage; that such a crushed-salvage sale would not even be worth wasting the necessary handling time on, as its past experience had established; and that if some other disposition were possible, the price at which the bottles could be moved, the size of the lots in which they could be sold, the length of time over which the operations would have to be extended, and the amount of expense which would be entailed, were elements of such uncertainty as to provide no practical basis for then deciding whether the task should even be attempted, and much less for making any present estimate of the probable return.

It appeared, however, that the corporation later had undertaken to circularize the smaller dairies in the territory and had offered the bottles for sale. The responses received showed that there existed a ready and reasonably remunerative market for a substantial quantity of the bottles at least. Beginning in 1945 and on into the early months of 1946, sales were thus made in a gross amount of approximately $13,000. By the end of two years, this figure had reached $18,900. But these sales, however, also had included some bottles which had had to be accepted from customers as returns after 1944.

Ernst and Ernst decided, on the factors presented by the situation, with the application of their accounting experience, skill and judgment, that the corporation, at the time the conversion was made, had not been warranted in charging off the bottles completely but could commercially have been expected to, and should reasonably have, set up a carrying value as of that time of $9,914.54. Among the matters taken into account by them in reaching this estimate, were the amount of the sales which it had been possible for the corporation to make during the 15 or 16 months period which

preceded their audit and the amount of expense which they estimated had been involved in the conditioning and handling of the bottles for these sales, together with a recognition of the fact that the sales made had included some bottles returned and accepted for credit from customers after 1944.

Plaintiff's accountants, whose audit report was not made until near the end of 1946, estimated the carrying-value which the corporation should have set up in 1944 for the bottles, in an amount equal to the aggregate of all the sales which had been made through the ensuing two years, and did not regard such handling expense and subsequent turn-ins as had been involved in these sales as being entitled to affect this amount.

All of the matters to which we have referred above, besides demonstrating the room for and the existence of difference in accountants' viewpoints and judgments, would seem also rather forcefully to point up the purpose and significance of the parties' action in agreeing to commit to an independent auditor the task of ascertaining and determining the corporation's earnings and in binding themselves that "the earnings determined by such audit shall be controlling" and that "thereupon the agreement of June 6, 1929 shall be carried out by the parties." Legally, as will be later discussed, the effect of this was to leave them without any right to escape such accounting result as might thus be produced, except as that result could be claimed to rest on fraud or on mistake so gross as to have amounted to legal irresponsibility in the undertaking.

Plaintiff, in the present suit, as we previously have indicated, was seeking to have the court ascertain and determine the amount of the net earnings per share of the common stock for the year 1944 as an open accounting matter, and to have specific performance of the repurchase agreement decreed on the basis of such accounting result as might thus be arrived at by the court itself.[4] One paragraph in the complaint did make reference to the provision in the

---

4. Plaintiff also of course asked resolution of the legal question which had been reserved by the parties, as to whether income taxes were or were not deductible in relation to the term "net earnings". This question will be later discussed.

agreement for the selection by the parties of an independent auditor to make an ascertainment and determination of the corporation's earnings, and to the fact that Ernst and Ernst had been so selected and had purported to make an audit report, but it alleged that Ernst and Ernst had "wholly failed and neglected to carry out the terms of said employment agreement and the instructions of the plaintiff with respect thereto or provided therein and that by virtue of said failure for an unreasonable length of time plaintiff has elected to rescind said agreement of employment."

To this attempted avoidance of the parties' auditing agreement and its result, defendant answered in effect that an ascertainment and determination of the corporation's earnings, such as had been provided for in the parties' agreement and was intended to be accomplished thereby, had been made by Ernst and Ernst and that this determination was "controlling" upon both of them in the situation, with only the question, therefore, of whether the term "net earnings" as used in the repurchase contract meant earnings before or after deduction of income taxes, being left open to the court for resolution.

The court apparently regarded the matter as one of probable accounting determination and made reference of it to a special master. The master thereafter held hearings, received testimony of witnesses and other evidence, took submission of the case, and after careful consideration made a report, containing findings of fact, conclusions of law, memorandum opinion and recommended order of judgment.

The master found that Ernst and Ernst had "followed good and accepted accounting principles" in making their audit and that the audit itself was "free from any dishonesty, misconduct, fraud or bad faith, or from gross error that would amount to bad faith." He accordingly concluded and held that the audit result was binding and "controlling" on the parties under their agreement. He further declared that the term "net earnings" in their agreement had a generally established and recognized meaning in commercial, accounting and legal use, synonymous with "net profits";

that the evidence did not persuade that the parties as a matter of intention had used the term differently or specially in their contract, such as in the sense of profits before deduction of income taxes; and that the term therefore should be taken as intended by them to mean earnings after making provision for income-tax liability, or such funds as properly could be used for payment of dividends to common stockholders. He regarded this "available-for-dividends" concept of earnings as having also direct confirmation in the language of the contract, that "In determining net earnings per share for any year it shall be considered that all of the earnings per share for any year belong to the holders of the common stock except sufficient to take care of the current annual dividends on the preferred stock for such year"—there being no right "to take care" of any dividends on the preferred stock until after provision had been made for income taxes.

Pursuant to all this, the master recommended a judgment for plaintiff on the basis of the earnings shown by Ernst and Ernst's report with income taxes deducted, but with the privilege granted plaintiff, if he should desire to retain his stock and continue as a stockholder, to have his action dismissed and have judgment entered against him for costs.

Plaintiff thereupon sought a review of the master's findings and conclusions, and the court engaged in such a review on the record made before the master. The court rejected the master's crucial findings that Ernst and Ernst's audit had been made on the basis of good and accepted accounting principles and that it was without dishonesty, misconduct, fraud, bad faith or gross error amounting to bad faith. In findings of its own, the court declared that the audit report of Ernst and Ernst "indicates bias, bad faith and collusion between the defendant and its officers and the auditors;" that it further was full of gross errors; that the auditors improperly had made inquiries and relied upon statements and explanations from defendant's officers as to various items, without consulting plaintiff and without making outside investigation, and some of the officers' representations were untrue;

that the audit had not been made on the basis of proper accounting principles and practice in the situation; and that in effect Ernst and Ernst had acted both unresponsively and irresponsibly in relation to the parties' contract and the submission made to them and thus had not at all performed the task for which they were engaged.

The court made a critical scrutiny of all corporate entries and transactions reflected in the record and applied its own accounting concepts and standards to them. And in this connection it refused to credit the testimony given by the officers of the corporation in explanation of various items, such as had been made to Ernst and Ernst in the course of their audit, notwithstanding that the master had seen and heard the officers testify as witnesses on the stand and had passed upon the truth of what they stated, in its relation to the question of whether Ernst and Ernst's audit rested on such a basis as to be impeachable for fraud or for mistake of a nature or extent that would constitute legal irresponsibility. So proceeding, the court arrived at a determination of its own of earnings of $227,475.-15, which it used as a basis for the value or price of plaintiff's stock. Plaintiff's auditors, as will be remembered, had arrived at earnings in their report of $220,739.23.

The court further held that the master had been wrong in regarding the term "net earnings" in the contract as being equivalent to and having been intended to mean "net profits", and declared that the term had been used and understood by the parties to mean earnings before deduction of income taxes. And finally, in the amount which it awarded plaintiff as judgment, the court allocated to plaintiff's stock, for purposes of fixing the value thereof, such part of the determined earnings as constituted the ratio between plaintiff's stock and the number of shares of common stock which were outstanding in 1929, when the repurchase agreement was made, and not the number of shares to which the stock had been increased through the intervening years, although all of this stock represented of course working capital of the same grade and necessarily had been equally contributive in the production of the earnings involved.

We think the court erroneously went beyond the functions which were open to it in the situation.

As has been previously emphasized, the parties had agreed, for purposes of plaintiff's right to sell and defendant's obligation to buy, as a facilitating incident in the carrying out of their agreement, that there should be an audit by a mutually selected expert accountant and that the determination of earnings arrived at by this accountant should be controlling upon both of them as to the price to be paid for the stock. This, it seems to us, was in its intention and effect simply a provision for an appraisal or evaluation of the corporation's earnings by an independent auditor, intended of course to be a product of proper accounting process, but with a necessary entrustment in the process to the judgment, discretion and skill of the selected expert on all matters where accountants could reasonably differ, whether of means or substance, in arriving at an ultimate result.

In general, where parties to a contract, before a dispute and in order to avoid one, provide for a method of ascertaining the value of something related to their dealings, the provision is one for an appraisement and not for an arbitration. 3 Am.Jur., Arbitration and Award, § 3, pp. 830, 831. But, under Minnesota law, as well as generally, the result of an appraisal which the parties have thus contracted to have made is just as conclusive upon them as would be an arbitration award—even though from the contract and the nature of the situation there may be involved no right to a hearing before the appraiser—if they have expressly stipulated that it shall be so conclusive, or if the intention to be so bound is fairly inferable from the language which they have used. State v. Equitable Ins. Co., 140 Minn. 48, 167 N.W. 292, 293; Nelson v. Charles Betcher Lbr. Co., 88 Minn. 517, 93 N.W. 661, 662. Such an appraisal or evaluation product which the parties have made contractually conclusive upon themselves is therefore, equally with an arbitration result, not open to escape by either of them, except where it is capable of impeachment "for fraud, or such mistake as would imply bad faith, or

a failure to exercise honest judgment." State v. Equitable Ins. Co., supra. See also Boyle v. Musser-Sauntry Land, Logging & Mfg. Co., 77 Minn. 206, 79 N.W. 659, 660; St. Paul & N. P. Ry. Co. v. Bradbury, 42 Minn. 222, 44 N.W. 1, 2. Thus, such an appraisal result cannot be judicially examined as a mere question of adequacy or inadequacy of amount but only as an issue of moral infirmity, in that it may lack integrity of undertaking, or in the sense that it involves errors of commission or omission "so gross as to evidence or establish fraud or corruption or partiality or malfeasance or misfeasance on the part of the appraisers." Mork v. Eureka-Security Fire & Marine Ins. Co., 230 Minn. 382, 42 N.W.2d 33, 38, 39. In other words, under Minnesota law, an appraisal or evaluation which the parties to a contract have provided for, and whose result they have bound themselves to accept, is conclusive upon them, except as it is vulnerable for moral taint, including mistake so fundamental or penetrative as to require its rejection, not as a question of inadequate factual result but as a matter of irresponsible legal product. Kaufman Jewelry Co. v. Insurance Co. of State of Pennsylvania, 172 Minn. 314, 215 N.W. 65, 66, 431.

 In the present situation, it further is to be borne in mind that the function of initially testing and resolving whether Ernst and Ernst's determination was thus vulnerable was one which had been committed to a master. In so far therefore as the question of vulnerability turned upon facts on which the master made resolving findings from the testimony, documents and circumstances in evidence, the court was not at liberty to reject the findings unless they were "clearly erroneous." Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. The threshold question here is accordingly the same as it was in the court below—whether the master's findings were in the situation entitled legally to be declared clearly erroneous. Morris Plan Industrial Bank v.

Henderson, 2 Cir., 131 F.2d 975, 976; Dunsdon v. Federal Land Bank of St. Paul, 8 Cir., 137 F.2d 84, 86.

On the record before us, we do not believe that the master's findings, that Ernst and Ernst's audit had been made on the basis of "good and accepted accounting principles" in the situation, and that it was "free from any dishonesty, misconduct, fraud or bad faith, or gross error that would amount to bad faith," could properly be declared to be clearly erroneous.

The trial court seems to have viewed Ernst and Ernst's task as an arbitration undertaking and not one of making an independent, expert accounting appraisal of the corporation's earnings. Thus, the court declared that Ernst and Ernst were "required to act as an umpire between the two" and that they had failed to do their duty when they made inquiries of and accepted explanations from the officers of the corporation on various items, "without attempting to make any outside or independent investigation of the facts and without any explanation or information from the plaintiff."

The provision of the original contract was, as has been noted, that "an audit shall be made by an independent auditor * * and the earnings determined by such audit shall be controlling." And this the facilitating supplemental agreement, making selection of Ernst and Ernst as such auditor, had repeated, in its provision for their "making an audit of all the books and records of the second party, or such part thereof as may be requested by either party, for the purpose of ascertaining and determining the net earnings per share of the common stock * * * and * * * when such audit has been made it shall be controlling of the net earnings * * *."

We do not think it soundly can be said that the legal effect of this was to constitute Ernst and Ernst as an "umpire" or arbiter, with an obligation to hear, consider and produce a result in relation to the contentions of the parties.[5] Rather, as

5. We do not of course mean to imply that an appraisal may not on its terms, nature or circumstances entitle the parties to a hearing before the appraiser as part of its intended process.

suggested above, it seems to us that what the contract provided for was the making of a sound accountancy appraisal of earnings, by an independent auditor, through the use necessarily of proper applicable auditing process, but with the ultimate result inherently to be produced by the judgment, discretion and skill which the selected expert would be called upon to exercise—not as an arbiter but as an accountant-evaluator—in all the various matters, whether of method or of merits, on which there could exist room for accountants reasonably to differ (not the parties to make contentions) in the situation.

The object of the provision, as pointed out, was to set up machinery for arriving functionally at the value or price of the stock involved, as an incident or step in effectuating the vendor-vendee status which the contract had given plaintiff the right to have created between them. That right, it incidentally may be noted, was wholly elective and not compulsory as to plaintiff and was without prohibition upon him of outside sale of his stock. He was free to remain a stockholder; he was at liberty to make an outside sale of his stock; or he could, if he chose, call upon defendant to make purchase of it. But if he chose to call upon defendant to become the purchaser, the contract, as a means of preventing this special relationship from being plagued with any dispute, made the price which was to be paid for the stock a matter that should be controlled by an independent accountancy determination or expert evaluation of the corporation's earnings, and not by an umpireship or arbitrament which would be required to lend ear to and resolve inter-party viewpoints or contentions. The rights and obligations of the situation had not been related to an airing, or a mediating, or a vindicating of partisan position, but to having an independent auditing result produced, by a selected expert, on the basis of sound accountancy technique and responsible professional undertaking.

Of course, such an autonomous pursuit would naturally present occasion within itself for engaging in a testing, verifying or proving of various items and transactions.

The point here, however, is that the method or extent of this would be in the situation a question of proper professional choice or responsibility in sound, independent accountancy undertaking and not of any process requirement in relation to dealing with some adversarial situation. Within whatever room there existed for reasonable difference in accountancy views or in accountants' opinion and judgment, choice of method and extent of testing, verifying or proving in the auditing task involved was as much a matter which the parties had contracted to entrust to Ernst and Ernst's professional skill, judgment and discretion as any other factor inherent in producing an accounting-appraisal result. Judicially, therefore, the question was not whether the court or another accountant individually might think that some aspect of the processes employed by Ernst and Ernst should have been different, but whether what they did was subject to being regarded professionally as not constituting proper accounting practice in a responsible accountancy determination of the corporation's earnings.

But beyond this, and more immediately here controlling, is the fact that the question was in any event not open to plenary redetermination by the court in the present situation. The master had admeasured the propriety, fairness and sufficiency of Ernst and Ernst's methods and processes as sound accountancy standards in the situation, on all the circumstances, documents, testimony and expert opinions in evidence, and had found as a fact that what they did had constituted good accounting practice and responsible professional undertaking. There was a sufficient basis of support for this factual appraisal and finding, and the situation was without anything beyond this, in what Ernst and Ernst did or did not do, that could be declared by the court to have been required to be rejected or adopted by them as a matter of law.

The court accordingly was not entitled to hold as a matter of law, that Ernst and Ernst had failed to use proper accounting methods or practices in the situation because they had made inquiries of the officers of the corporation during the course of the audit, without in turn consulting

plaintiff or resorting to outside investigation. Nor could the court declare that Ernst and Ernst had no right to believe the officers or to become satisfied by their explanations of the reasonableness and propriety of the corporation's treatment of some of the items about which inquiry was made, when the master, who saw the officers testify on the witness stand and heard them repeat the explanations made to Ernst and Ernst, credited their statements to the extent of finding as a fact that Ernst and Ernst's audit was free from gross mistake or other irresponsible infirmity. Against this, there was no room for the court to say that Ernst and Ernst's audit rested on gross mistake of facts—and much less could there be any basis for accusing them of "bias, bad faith and collusion" in what they did.

It is possible that the court's rejection of the master's findings and its entry upon the task of making an accounting determination of its own may have been induced primarily by its concept of Ernst and Ernst's function and obligation as an "umpire" or arbitrator instead of an auditor-appraiser. Incidentally, it may be observed that the amount of the court's determination not only differed from that of Ernst and Ernst but also went beyond that of plaintiff's accountants by approximately $7,000.

Some understanding of the variation between Ernst and Ernst's determination and that of plaintiff's accountants has been given above. Its professional significance also is afforded light by what one of plaintiff's accountants said on cross-examination: " * * * let it be understood that accounting is not an exact science. It is an art. Let it not be claimed by anyone that three certified public accountants examining the same set of books need come up with the same answer of net income. They can all be of equal ability and they can all be equally skilled. And if there be contention on anybody's part that the purpose for which an examination is made has no effect on the nature of the work, or nature of the report made, then I say that such a contention is stupid." All of this only lends reason and emphasis to why the parties had contractually agreed that they would leave the question of the corporation's earnings in their vendor-vendee relationship entirely to the professional determination or appraisal of an independent auditor and would abide by such result as was produced by him on the basis of appropriate accounting process and a reasonable exercise of his expert skill and judgment.

 Summarizing what has been said —besides the right to have the result reached by Ernst and Ernst rest on proper accounting process, implicit from having made the determination of earnings a matter of auditing appraisal, the only right which either plaintiff or defendant possessed to escape that result was for moral infirmity entering into its production, from fraud or from error so gross as to amount to irresponsible legal undertaking. All of these considerations were questions on which the master made determinations and on which the master's findings could not properly be branded as clearly erroneous facts on the evidence or as a matter of law otherwise. The court therefore erred, on the basis of the master's findings, in refusing to accept Ernst and Ernst's determination of earnings as controlling of the amount for which plaintiff was entitled to judgment.

The second question for consideration is whether the court similarly erred in holding that the term "net earnings," as used in the contract, for purposes of fixing the value or price of plaintiff's stock, meant legally, and also as a matter of intention in fact, earnings without deduction of income taxes.

The term "net earnings" could not on the record be said to be required to be given the meaning in the situation of earnings without deduction of income taxes, as a matter of law. Here again, as with the question previously discussed, the matter turned upon evidentiary considerations before the master, which did not have such absoluteness as to make the question of intended meaning one of mere legal conclusion or of inescapable factual result. Plaintiff himself recognized that the language used did not nakedly compel acceptance of the meaning for which he was

contending but he sought by extrinsic evidence to establish such a connotation as a matter of law, on the basis of the art as it existed in 1929, as well as from the circumstances and setting of the contractual situation and the parties' subsequent relations.

Within the evidence of the record, it is clear that, when plaintiff exercised his option to require defendant to purchase his stock, the term "net earnings" was recognized in the accounting world, and still is, as being synonymous generally with net profits, or in other words as normally implying, in terms of stockholder relationship, the amount of earnings which would be capable of being distributed to stockholders. And the language of the contract, in speaking of earnings "except sufficient to take care of the current annual dividends on the preferred stock", might well be regarded, as the master did, as being suggestive of relationship in fact to this concept, in that, as has been observed, whether earnings were sufficient to "take care" of preferred-stock dividends would not in corporate operation be subject to determination legally or to significance naturally without taking into account or making provision for the income-tax liability of the corporation.

But plaintiff attempted to establish by extrinsic evidence that in 1929, when the contract was made, the term "net earnings" had a broader general meaning in the field of accountancy than its present one of "net profits" and was used rather to denote "net operating profits", so that it did not involve any consideration of income-tax liability. There was evidence to support this contention but there also was evidence tending to indicate that such was not the general fact. The master appraised this unabsolute evidence and declared, equivalently as a finding, that he did not believe that there had been any such general recognition or use by the accounting profession in 1929, of the term "net earnings" as being equivalent to "net operating profits", as could be said to have imparted that meaning to the language of the contract as a matter of law. Instead, it appeared to him, and he so found, that the fact of the art was that, then as

now, "net earnings" rather had the meaning in the accounting field generally of "net profits", and that the evidence of circumstances, setting and relations, which was before him, did not establish any other intended use of the term by the parties. He made the further specific finding in his memorandum opinion that the parties had used, understood and intended the term "net earnings" to mean "net profits" or, as expressed by him, "with intent to convey to the parties that what was meant was the net available for distribution to the stockholders as dividends—if the Board of Directors saw fit to declare and distribute to the stockholders—the first payment to be to the preferred stockholders as their contracts provided, and then the balance distributed to the common stockholders."

These appraisals of fact—whether the term "net earnings" had such technical, widespread and accepted meaning in the art of accountancy at the time as to have imparted to its use in the contract, as a matter of law or of evidentiary persuasiveness, the significance of "net operating profits" rather than actual "net profits", or whether, if such was not the case, the situation was one in which, on the circumstances, setting and relations, this special significance nevertheless should be accorded the term on the basis of actual intention—were in our opinion sufficiently supported by the evidence in the record so that they could not properly be declared to be clearly erroneous as facts, and were sufficiently controlling of the legal situation confronting so as to require the court to give effect to the conclusion which the master reached.

Ascertainment of what the terms of a contract actually are, where they are ambiguous and where the extrinsic evidence to illuminate is not of unequivocal effect, is functionally a matter of fact-determination. Floyd v. Ring Construction Co., 8 Cir., 165 F.2d 125, 129; State v. Fellows, 98 Minn. 179, 187; 107 N.W. 542, 108 N.W. 825; Texas & St. L. Ry. Co. v. Rust, C.C., E.D.Ark., 19 F. 239.

Repeating—the question of determining what the terms of the contract here were, under the parties' use of the

expression "net earnings", was on the evidence controllingly one of fact for the master, and, as we have said, on the record before us, the court was not entitled to reject as clearly erroneous the findings which the master made. Opposite factual views might perhaps with equal right have been capable of being reached on the evidence and might have been required to be sustained by us, had they constituted initial determination in judicial administration. But here it was the master and not the court which was the initial fact appraiser, and the court could not, under Rule 53(e)(2), Federal Rules of Civil Procedure, 28 U.S.C.A., refuse to recognize the master's findings or escape the conclusion to which they led, merely because of a difference in personal persuasion on the evidence or a dissatisfaction with the result reached.

The final question is whether the court also erred in allocating to plaintiff's stock, for purposes of fixing its value or price under the contract, such part of the net earnings as represented the ratio between plaintiff's stock and the number of shares of common stock outstanding in 1929 rather than the amount outstanding when plaintiff chose to exercise his option to sell.

The question of using such a divisor for arriving at the "net earnings per share" of plaintiff's stock does not appear to have been raised before the master but seems to have been first injected in the review which plaintiff sought from the court. There is no language in the contract on which to predicate as a matter of law such an artificial allocation of earnings as the basis for valuing plaintiff's stock. Nor can we find anything in the evidence to warrant or support it factually as a reasonable inference of party intention.

Plaintiff's stock had been issued to him in 1929, in payment for his existing stockholder interest in one of two dairy companies which were being consolidated into the defendant corporation. The corporation in which plaintiff was a stockholder and had a controlling interest was the smaller of the two companies being consolidated into the new corporation. It was to enable him to get out of the new corporation if he wanted to do so that defendant gave him the right to sell back to it the common stock which he was receiving in the consolidation. Plaintiff apparently was in no hurry to get out but chose to ride the wave of the corporation's fortunes for 15 years, until a crest of earnings from special army-camp business occurred in 1944.

The stock which had been issued to the old stockholders of the two consolidated corporations did not exhaust the amount of defendant's authorized capitalization under its corporate charter. The remaining stock was of course legally subject to being sold at any time that the corporation might deem it advisable to do so. No common stockholder was given any preferential right above another to make purchases of it. The articles of incorporation gave each preferred-stockholder the right to convert his preferred stock into common, on a fixed basis, should he choose to do so. Between 1929 and 1945, while plaintiff was a stockholder and a director, some conversions of preferred stock by officers of the corporation were thus made in regular course. These conversions necessarily reduced the amount of preferred-stock dividends which the corporation thereafter had to pay. Ten thousand dollars worth of treasury common stock also was issued by the corporation for cash, and this cash was added to the corporation's working capital. The amount of common-stock investment, so increased, which was outstanding at the time plaintiff chose to sell his stock, had all constituted working capital of the same grade in the corporation's structure and operations and had been equally contributive as a capital force in the production of the corporation's earnings.

We are unable to see in this situation any basis whatsoever for the court's declaration that "Obviously, the purchase agreement was devised to afford (plaintiff) an opportunity to retire from the company on the same proportionate basis on which (he) entered it." This contractual view would conversely seem to have required the holding, if reductions instead of increases had

occurred in the amount of the initially issued common stock other than that of plaintiff, and plaintiff's capital investment thereby had become a greater proportionate factor in the production of the earnings involved than it would have constituted at the time the contract was made, that plaintiff was not entitled to have the question of earnings considered on that basis in relation to his contract, because "the purchase agreement was devised to afford (him) an opportunity to retire from the company [only] on the same proportionate basis on which (he) entered it." The effect of this would be in the one case to give him a part of the capitalized value of someone else's investment and in the other to deprive him of a part of the capitalized value of his own. Such an unusual and inequitable result should not be made to occur in either situation without plain compulsion from the contract itself. 12 Am.Jur., Contracts, § 250, pp. 792, 793.

What has been said is also controlling of plaintiff's attempt to have his contention made specifically applicable to 100 shares of common stock standing in the name of and paid for by A. E. Riedel Company, a family corporation owned by some of the officers of defendant, so as to exclude these shares from use as part of the divisor or denominator in an allocation of earnings per share to plaintiff's stock. This stock was originally issued to a third party in payment of his stockholder interest in one of the consolidated corporations. Unlike plaintiff, this stockholder preferred to convert his new stock immediately into cash, and the A. E. Riedel Company agreed to take the stock off his hands as a purchaser. There had been some previous talk about plaintiff purchasing the stock, but he was not at the time in a financial position to do so. Plaintiff did however desire to obtain more stock in the defendant corporation, and defendant's officers testified that they had told him that he might do so at any time. Plaintiff sent in money to defendant at various times through the course of the next three years, until he had paid for and had received 100 additional shares of stock. It was his present contention that what he intended to pay for and had

the right to receive was the A. E. Riedel Company stock instead of new stock.

But his remittances were sent in to defendant, and the money did not go to the A. E. Riedel Company but into the treasury and structure of the defendant. Both the investment of the A. E. Riedel Company and that from the 100 shares of treasury stock issued to plaintiff were made a part of the working capital of the corporation, remained so throughout all the intervening years from 1932 to 1944 and had been equal factors in the production of the earnings here in controversy. The question of plaintiff's right to buy the A. E. Riedel Company stock would therefore not seem to be of legal or equitable significance except as it might have constituted the sole source from which he could have obtained additional stock. The corporation had the right to make additions to its working capital out of its unissued stock; it was willing to make sale of 100 new shares at the time; and it could have permitted either plaintiff or the A. E. Riedel Company to become the purchaser.

Since, as we have said, there was nothing in plaintiff's contract that prevented the corporation from increasing its working capital, and nothing that entitled him to have the earnings from such increases of capital allocated to his stock in any manner, his position here is no more affected by the fact that the A. E. Riedel Company retained its stock and new treasury stock was issued by defendant to plaintiff than it would have been if the A. E. Riedel Company had assigned to plaintiff the stock it held and had made purchase from defendant of the 100 shares issued to plaintiff in replacement.

Nor is there any force in plaintiff's further argument that the 100 new shares should be left out of consideration and his stock treated as consisting of the A. E. Riedel Company shares, because the minutes of the board of directors of defendant contain no formal resolution authorizing issuance and sale of the 100 shares of treasury stock. As has been noted, the stock had been issued and the money received by the corporation from 12 to 14 years previously. After having been dur-

ing all of that time carried on the corporation's records and financial statements, made a part of the corporation's producing structure, and given recognition with the other stock in the declaration and payment of dividends, the mere lack of a formal resolution for its issuance would hardly have sufficient strength to sustain a collateral declaration of legal invalidity here, or to merit any consideration of equitable rejection in favor of one who had had the position and responsibility throughout all these years of a director of the corporation. Neither the contract, the circumstances, nor the results provide here any ground of legal command or equitable persuasion for deducting the A. E. Riedel Company stock from the denominator which is entitled to be used in the allocation of earnings per share to plaintiff's stock.

From what has been said, it follows that the judgment must be reversed. In the further proceedings which will accordingly have to be had in the District Court, the question may perhaps arise as to plaintiff's right to interest upon the amount to which he is entitled to judgment on the basis of Ernst and Ernst's determination, because of the indication in the record that a tender of this amount had been made to him by defendant prior to the institution of the present suit. The amended answer made recital of the fact of this previous tender, but it should be noted that it did not in terms make renewal of the tender or purport to continue it in force. In fact, defendant has sought by its pleading to prevent plaintiff from obtaining any recovery whatever, in alleging that plaintiff's right to compel defendant to purchase his stock was one that had duration for a reasonable time only; that plaintiff did not exercise his right within such time; and that therefore "any right of plaintiff to compel such purchase had expired" and the court should decree that "plaintiff take nothing by this action." It is elementary that a tender to be effective in stopping interest and costs must ordinarily be kept good. Balme v. Wambaugh, 16 Minn. 116; Dunn v. Hunt, 63 Minn. 484, 65 N.W. 948. There is noth-

ing the present situation to take it out of the operation of this rule.

Reversed and remanded for further proceedings not inconsistent with this opinion.