HARMON *v.* SCHWARTZ, ET UX.

[No. 247, September Term, 1967.]

166

*Decided May 29, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*John K. Keane, Jr.,* with whom were *Theodore L. Miazga* and *Miazga & Miazga* on the brief, for appellant.

*Howard E. Goldman,* with whom were *Schwartz & Goldman* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

Harmon, the appellant, built a house for the Schwartzes and a dispute arose as to whether Harmon had been paid in full the agreed price plus the cost of extra work and as to whether he had performed fully and well. Harmon filed suit in 1960 and on June 12, 1964, in the midst of the trial of the case Harmon and the Schwartzes entered into an agreement written in longhand in the court house, entitled "Arbitration Agreement." It provided:

> "Agreement to Submit Case to Arbitration.
>
> "The parties hereto do hereby agree to submit the dispute in the above styled cause to arbitration, by a majority vote or award of two of the three arbitrators to be hereafter named. One arbitrator to be named by plaintiff one by defendants, and those named shall choose the third. The parties shall each name their arbitrator within one * * * week from this day and the arbitrators shall choose the third arbitrator within * * * three * * * weeks from the date hereto. Hearings shall be promptly made and the defendants shall make property available for inspection. Arbitrators shall notify parties of time and place of taking evidence at least one week in advance thereof and may continue hearings from day to day or time to time. The arbitrators shall determine all issues in said case and interest on money from date due.
>
> "The parties agree that the determination is to be in accordance with the rules governing contracts generally as well as custom of the trade. Each party to pay for their arbitrator & split cost of third."

Each side picked an experienced and reputable builder as its arbitrator and these two selected a lawyer whose only par-

ticipation, with the acquiescence of the parties, seems to have been as a coordinator of the efforts of the experts. On March 3, 1967, each builder wrote the lawyer that the other

> "and myself have gone over and reviewed the plans, specifications and contract, and then together we physically inspected the Schwartz property.
>
> "As a result of the inspection and verifications we are in mutual agreement that Mr. Harmon is not entitled to any monies."

Harmon and his lawyer were sent copies of the letters of the two builders on March 7, and on April 26 Harmon filed a petition to vacate the arbitrators' award alleging in material part that:

> "4. That Louis Perlmutter was named by the defendants as their arbitrator, and Lester M. Redmiles was named by the plaintiff. That in turn they chose Leonard S. Blondes, an attorney, to be the third arbitrator. That the arbitrators, Louis Perlmutter and Lester M. Redmiles, met at the premises constructed by the plaintiff for the defendants with the defendant, Stuart Schwartz.
>
> "5. That neither the plaintiff nor his attorney were notified of the time and place of the meeting, and that extras in the amount of work done and materials furnished by the plaintiff were not pointed out to the arbitrators. The only version of what was done was that given by Stuart Schwartz, the defendant. That the arbitrators did not have sufficient facts or testimony before them to make an intelligent and fair decision in the matter.
>
> * * *
>
> "8. That after having viewed the premises, the plaintiff did not have an opportunity to discuss with the arbitrators what extras or other things they were taking into consideration and which items were pointed out to them as work done by the plaintiff which he claims compensation for."

After taking testimony Judge Powers held that:

> "the arbitration agreement entered into between the parties was substantially complied with by the arbitrators, and that after the award the plaintiff in this case was, by reason of his conduct up to that point, no longer in a position to object to the award because the award was unfavorable to him."

We think Judge Powers' conclusions were correct.

The arbitration agreement provided that "hearings shall be promptly made and defendants shall make the property available for inspection. Arbitrators shall notify parties of time and place of taking evidence at least one week in advance thereof and may continue hearings from day to day or time to time." The meaning that the quoted language appears to offer is that a distinction was intended and made between hearings at which testimony would be taken and the parties were to be present and a physical inspection of the property by the expert builders at which they could put values on the work Harmon had done, without the required presence of the parties.

In similar situations we have held that impartial deciders of controversy, within the limits of their delegated authority, may act and decide upon their own knowledge and special skills and upon their own investigations made in the absence of both or one of the parties. In *Litman v. Holtzman,* 219 Md. 353, we said that this is true where the intent of the disputants and the character of the questions and issues to be answered make the procedure, regardless of the label that has been bestowed upon it, an appraisal or "an * * * arbitration in the nature of an appraisal," *Parr Construction Co. v. Pomer,* 217 Md. 539, 544, rather than a true arbitration. *Litman* involved a determination submitted to independent experts of the reasonable cost of a construction company's work on a dwelling and the complaint was the experts had talked to and received information from the president of the company without the presence of the home owners. We said (pp. 359-60):

> "These legal labels [arbitration or appraisal] have significance [in the determination of procedural re-

quirements], because where the agreement is to arbitrate differences or disputes, those who are to decide act quasi-judicially and may receive the evidence or views of a party to the dispute only in the presence of, or upon notice to, the other side, and may adjudge the matters to be decided essentially only on what is presented to them in the course of an adversary proceeding. On the other hand, where the intent of the submission is that the impartial determiners are primarily to ascertain facts, they may act upon their own knowledge and special skills and upon their own investigations; they are not required to hear evidence from, or the views of, a party only in the presence of, or upon notice to, the other side; and they are allowed a wide discretion as to procedures and sources of information, within the limits of the agreement defining their authority. * * *

* * *

"Whether the procedures required are those of an arbitration or those of an appraisal is to be found from the intent of the disputants or from the character of the questions and issues to be answered, or both. The name the parties call the proceeding, or those who are to give the answers, is not decisive. It is generally held, particularly in the more recent cases, that where the submission to others is for the determination of prices, values, quantities, qualities or the verification of the performance of a construction or engineering contract, the agreement is likely to partake of the character of, and be governed by the rules as to, an appraisal."

As far as the inspection of the Schwartz house is concerned the arbitrators in the present case, like those in *Litman,* were intended to act as appraisers rather than as arbitrators. Schwartz, Harmon, the two umpire-builders and Harmon's lawyer had met at the office of the lawyer-umpire. The discussion revealed differences that obviously could not be intelligently evaluated by colloquy. It was agreed that Harmon and Schwartz

each would make a list of his contentions and claims and each would thereafter submit a detailed answer to each of the contentions and claims of the other. The arbitrators studied the writings and the plans, specifications and contract. Thereafter, the lawyer-umpire wrote to each: "now that you have the memos from both parties please review the matters closely and make an inspection of the premises * * *." Judge Powers found, reasonably in our view, that this letter created "a rather strong inference that the two arbitrators are to inspect the property."

There are indications that Harmon at least waived any possible requirement that the inspection was to be made in his presence. Harmon's expert builder made three or four efforts to locate him before the inspection, unsuccessfully because Harmon moved frequently and had no telephone. After Harmon's lawyer—and, it reasonably may be inferred, Harmon—learned that the inspection had taken place, he wrote the lawyer-umpire on February 21 without hint of surprise, dissatisfaction or objection, saying merely: "I understand that the arbitrators met on the Schwartz matter. Is there anything further that you need to help arrive at a judgment in this matter?" The lawyer-umpire wrote back: "Please be advised that we are in the process of trying to get together with [the two builders] * * * to draw up the final list. As soon as this has been accomplished I will be in contact with you." Harmon's lawyer again made no protest to the past or the suggested procedures and no request for an opportunity to argue the case or to rebut or change the views or inclinations the umpirebuilders had gathered at the inspection.

We find no actual unfairness or prejudice to Harmon in the inspection of the house with only Schwartz present. He had lived in the house for five years and, according to his testimony and that of each of the builders, he acted only as a guide and amanuensis. In response to a question as to what were the mechanics of the inspection, Schwartz said that:

> "A. They took each item on Mr. Harmon's list of contentions. Then read my answer to it. Then verified the plans and specifications in reference to the point,

and if it was applicable made a physical inspection of the particular area that they were talking about. And then they made an assessment, as far as the value of this particular extra was concerned.

"After going through this entire list of Harmon's list and my rebuttal the sheet was added up and a total was arrived at as to how much they felt Mr. Harmon was entitled to by way of extras. This sum was added to the contract price and they came up with a grand total of what should have been paid to Mr. Harmon.

"Then they took two other figures, the amount of money which was actually paid to Mr. Harmon by way of checks and how much was paid off in the way of mechanics liens. That second grand total came out to be a larger figure than the first grand total. They were going to embark upon my list of contentions that I had submitted and I said, 'Let's not waste time doing this because I'm already on the plus side, and as far as I'm concerned I'll just as soon resolve this issue and not waste any more time that I am owed, just to forget the whole thing and get it clear once and for all, because this thing has been going on for seven years.' I said, 'I'm satisfied not to get a judgment against Mr. Harmon,' and so this is where they left it.

"They had been working at it for several hours and that was the conclusion of the mechanics.

\* \* \*

"Q. Did the arbitrators ask you to show them where this work was supposedly done that was alleged in the list of contentions by Mr. Harmon?

"A. There were times, yes, where I escorted them to the place. Being my house I was more familiar with it than anyone else. I did escort them.

"Q. After you showed them the location was there any further instructions, any further assistance that you rendered in this inspection?

"A. The only thing that—I didn't render any assistance except sometimes I said, 'Well, this item is not

contested.' The only thing they had to do was put a valuation on it. I let them put—I wasn't argumentative, trying to propound the point. The papers more or less spoke for themselves.

"Q. What disposition was made with your list of contentions at this meeting?

"A. Nothing. There was nothing done with either my list of contentions nor Mr. Harmon's rebuttal to my list of contentions. I specifically said, 'There's no sense in going any further. Let's leave it where it is. As long as I am on the plus side already let's wash the whole thing out.' "

The trial court rightly refused to disturb the arbitration.

*Order affirmed, with costs.*