LITMAN ET AL. *v.* HOLTZMAN ET AL.

[No. 168, September Term, 1958.]

---

356

*Decided March 18, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and DIGGES, J., Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Lawrence I. Weisman,* with whom was *J. Francis Ford* on the brief, for the appellants.

*Albert L. Sklar* and *Theodore S. Miller,* with whom were *Sklar & Sullivan* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

An accountant, selected as a disinterested umpire, determined that a construction company was due some $15,000 by a couple for whom it had partially built a home. At the suit of the couple, the chancellor set aside the award, primarily, it would seem, because of his conviction that the parties should have selected an architect rather than an accountant to act as umpire.

Mr. and Mrs. Samuel Holtzman agreed to purchase from

Admiral Realty & Bldg. Co., Inc., a dwelling to be erected in Baltimore County at a price of some $57,000. When the house was partially completed, the Holtzmans ordered Admiral off the job and employed another builder, one Kroll, to complete the house. Admiral sued the Holtzmans in Baltimore on the contract and filed a mechanics' lien in Baltimore County. The Holtzmans sued Admiral in Baltimore County seeking damages. The parties agreed in writing to settle their differences. The preambles set forth the pending litigation, that Admiral claimed $17,000 to be due it, that the Holtzmans desired to have their own accountant audit the books and records of Admiral, that the objective of the parties was "to determine the actual cost of the work done", and that the respective auditors of the parties in attempting to agree as to actual cost, should not only separately audit the books and records of Admiral but "obtain and consider such other data and information, including an analysis and comparative audit of other properties" erected by Admiral "as may be relevant."

The agreement was that Admiral's auditor, Jerome Schuman, and the Holtzmans' auditor, Sydney D. Rapkin, should act as "auditors and arbitrators" to determine the "actual cost figures incident to the erection of the dwelling house." The auditors were directed to add to the agreed land cost, "the reasonable costs of labor, Social Security and Unemployment Compensation taxes, Workmen's Compensation Insurance, cost of materials purchased and * * * subcontractors paid", plus 10% overhead and 10% profit. It was stipulated that "actual cost" was to mean "moneys reasonably expended" by Admiral in the building of the house and was to be limited to "the type and mode of expenses normally and customarily incurred by a builder in residential construction." If the auditors were unable to agree, they were to select "a Certified Public Accountant or a Certified Public Accounting firm to serve as umpire." The umpire was "to independently examine their respective audits, and the books, original records and such other data and information as he may require in connection with this matter, and determine therefrom the correct reasonable figures in accordance with the formula as above set forth." It was agreed that Admiral might have

its auditor Schuman always present during any audit of Rapkin or the umpire.

The parties contracted that each would be finally bound by the decision of the arbitrators, or the umpire, that the amount awarded was to be paid within ten days of the award, and, finally, that upon payment of the award, the litigation in Baltimore City and Baltimore County was to be dismissed.

The Holtzmans, in their bill to set aside the award, claim that Harry B. Gorfine, individually, and not his firm of Harry B. Gorfine and Co., had been selected as umpire and that Gorfine improperly and unlawfully had delegated his duties to associates, that the umpire had held meetings with, and obtained information from, Admiral's representatives and others without notice to, or in the presence of, the Holtzmans, and that such conduct voided the award, and, finally, that the umpire used improper standards in arriving at his decision.

The chancellor found that there had been no wrongful delegation and we agree. Soon after the submission was signed, it became apparent that Schuman and Rapkin could not concur, and Schuman suggested as umpire any of several nationally known accountants, such as Haskins and Sells, Price, Waterhouse & Co., and Ernst and Ernst. Rapkin rejected these and submitted a counter list which included the name of Harry B. Gorfine and Co. Schuman agreed to this nomination and wrote a letter to Harry B. Gorfine, using the salutation "Dear Harry" and advising him that it had been decided by Rapkin and the writer that he was to serve as umpire. A reply was sent immediately to Schuman which said: "This letter is to acknowledge and accept your appointment of us to act as umpire." The letter was signed Harry B. Gorfine and Co. by Peter J. Woytowitz. The testimony is that Woytowitz, who is a certified public accountant and a lawyer, was particularly well-versed in accounting procedures and problems of building and construction firms and for this reason was selected by his employer to do the "leg work" in connection with the determinations to be made. The record leaves no doubt that Gorfine directed and guided Woytowitz at all times and that he personally made all decisions during the course of the investigation and in the final determinations.

It is likewise clear that Holtzman, Rapkin and Kroll were fully aware over a period of many months that Woytowitz was assembling data and information for Gorfine to assess, and not only made no objection whatever but cooperated fully with Woytowitz and accepted and seemingly acquiesced in his participation.

The Holtzmans cite cases such as *Frankford Distilleries v. Burns Bottling Machine Works*, 174 Md. 12, 17, in relying on the principle that an arbiter may not delegate to another the duty which he is chosen to discharge; because if he did, the judgment exercised would be that of one not within the contemplation of the parties. The rule contended for is established and sound, but it does not come into play on the facts before us now. If the liberal assumption be made that Gorfine and not his firm was intended as the umpire, it is apparent that Gorfine gave to the fullest his individual and personal attention and that although he was aided by his employee in procuring the facts, figures, data and verifications, all pertinent and essential judgments, tentative and final, were his. There was no improper delegation.

We come, then, to the heart of the case—was the agreement of Admiral and the Holtzmans for submission to independent determination of the cost of Admiral's work intended to be an arbitration or an appraisal? These legal labels have significance, because where the agreement is to arbitrate differences or disputes, those who are to decide act quasi-judicially and may receive the evidence or views of a party to the dispute only in the presence of, or upon notice to, the other side, and may adjudge the matters to be decided essentially only on what is presented to them in the course of an adversary proceeding. On the other hand, where the intent of the submission is that the impartial determiners are primarily to ascertain facts, they may act upon their own knowledge and special skills and upon their own investigations; they are not required to hear evidence from, or the views of, a party only in the presence of, or upon notice to, the other side; and they are allowed a wide discretion as to procedures and sources of information, within the limits of the agreement defining their authority. 6 Williston, *Contracts,* Rev. Ed.,

Sec. 1921A; 3 Am. Jur. *Arbitration and Award* Sec. 3, pp. 830-831; 6 C. J. S. *Arbitration and Award* Sec. 1, pp. 153-154. The distinction is discussed by Judge Chesnut in *Seldner Corp. v. W. R. Grace & Co., 22* F. Supp. 388. In *Wilson v. Boor,* 40 Md. 483, 489, it is said that if the agreement of submission by its terms does not contemplate testimony or adversary hearings, they are not required.

In *Eliot v. Coulter* (Mass.), 76 N. E. 2d 19, 21, the Supreme Judicial Court of Massachusetts said that although the disinterested persons, who were to determine the fair value of certain land, were called arbitrators, they were actually appraisers. The Court adopted the succinct language of an earlier Massachusetts case which pointed out that the rules governing an appraisal differ markedly from those as to an ordinary submission to arbitration because in appraisals, "The decision may be made without notice to or hearing of the parties, unless such notice and hearing be required by express provision or reasonable implication; and it may be made upon such principles as the person agreed on may see fit honestly to adopt, or upon such evidence as he may choose to receive." See *Bewick v. Mecham* (Cal.), 156 P. 2d 757, and the cases cited in the annotations in 157 A. L. R. 1286 and 54 A. L. R. 1255.

Whether the procedures required are those of an arbitration or those of an appraisal is to be found from the intent of the disputants or from the character of the questions and issues to be answered, or both. The name the parties call the proceeding, or those who are to give the answers, is not decisive. It is generally held, particularly in the more recent cases, that where the submission to others is for the determination of prices, values, quantities, qualities or the verification of the performance of a construction or engineering contract, the agreement is likely to partake of the character of, and be governed by the rules as to, an appraisal. Williston, *op. cit. supra,* p. 5376. We think it clear from their agreement that Admiral and the Holtzmans did not intend their respective accountants or the umpire to hold adversary hearings; nor did they contemplate that it would be improper for their or his agents to ascertain facts or receive information from one

side without the presence or knowledge of the other, or privately from outsiders. The agreement called for separate audits by Schuman and Rapkin, who were to seek actual costs from Admiral's books and records and from "such other data and information * * * as may be relevant." Manifestly, nobody thought that in doing this the auditors would hold adversary hearings and take testimony. Customary auditing practice does not include the ascertainment of facts or results only in the presence of those of opposing views. Auditing is essentially a unilateral investigatory process. The umpire, under the agreement, is to be an independent auditor, and it directs him, as an accountant, to do exactly what the accountants representing the parties were to do.

The construction we put on the agreement is supported by the conduct of the parties. Although the Holtzmans complained that Gorfine talked privately to Doccolo, the president of Admiral, Holtzman himself, his lawyer, and Rapkin called on Gorfine without the knowledge or presence of Admiral. On another occasion, Holtzman visited Gorfine at his office and had lunch with him. Rapkin's audits, on which Gorfine relied in reaching his decision, were never shown to Schuman or Admiral. Kroll, the builder who finished the house and advised the Holtzmans and Rapkin, visited Gorfine and gave him information without the presence of Admiral. What the Holtzmans did, pursuant to the agreement, is not consistent with their claim that Gorfine was to conduct the submission as would an arbitrator rather than as an accountant making an appraisal.

The view we take is not essentially dissimilar to that of the Court in *Sanitary Farm Dairies v. Gammel,* 195 F. 2d 106, 114-115 (C. A., 8th Cir.). There, a nationally known accounting firm was appointed as an independent auditor to determine the earnings of a corporation for a stated period to serve as the basis for the purchase price of stock of the corporation. The trial court viewed the accountants' task as an arbitration and, declaring that they had failed in their duty when they made inquiries of, and accepted explanations and information from, one side without the presence of the other side, set the award aside. The appellate court reversed

saying that the accountants had no obligation "to hear, consider and produce a result in relation to the contentions of the parties. Rather, as suggested above, it seems to us that what the contract provided for was the making of a sound accountancy appraisal of earnings, by an independent auditor, through the use necessarily of proper applicable auditing process, but with the ultimate result inherently to be produced by the judgment, discretion and skill which the selected expert would be called upon to exercise—not as an arbiter but as an accountant-evaluator—in all the various matters, whether of method or of merits, on which there could exist room for accountants reasonably to differ (not the parties to make contentions) in the situation." See, too, *Eliot v. Coulter, supra; Bewick v. Mecham, supra.*

In *Parr Constr. Co. v. Pomer,* 217 Md. 539, the disputants referred their difference to "an impartial arbitrator" to determine the number of cubic yards one had excavated for the other. He made the computations from data supplied by the engineers of one side. We said the submission was "essentially of the same character as an appraisal" and that the agreement of the parties amounted to one "for arbitration in the nature of an appraisal." Cf. *Randall v. Glenn,* 2 Gill 430.

The final contention of the Holtzmans is that Gorfine wrongly interpreted what the agreement meant when it directed ascertainment of the "reasonable" costs of Admiral's work. Gorfine said in the preface to his written and certified award that he had been influenced by what he felt to be the spirit as well as the letter of the agreement, and read the term "reasonable" as used therein as meaning "just and fairminded" and not "inexpensive or moderately priced." He then said he had been charged "not only with determining that the costs were reflected on the books in accordance with generally accepted accounting principles, but also with the additional burden of determining whether these costs were reasonable under the circumstances."

The record shows that Schuman submitted to Gorfine his audit of the actual reasonable costs and that Rapkin finally turned in a similar audit, described by Gorfine as full and

thorough and supported by detailed schedules. The areas in dispute were thus made apparent and defined. Gorfine called on Doccolo, Admiral's president, and Kroll, Holtzman's final builder and adviser, for help in resolving them. Sometimes Doccolo, at Gorfine's direction, went to subcontractors and, in a few instances, to losing bidders, to bring back verifications of the cost and reasonableness of various kinds of work done on the house.

The two areas of greatest dispute were the cost of the lumber and the cost of labor. Schuman prepared one estimate of lumber costs and Rapkin a much lower one. Gorfine considered these and Doccolo's and Kroll's comments and opinions, and then made independent checks with lumber companies and those in the building trade to determine the number of feet of lumber that reasonably should have been put in a house of the size and kind that was being built, and whether the price paid was reasonable. The labor costs were determined similarly—much of Rapkin's estimate on this item was finally accepted—after Social Security and income tax records and returns had been checked, and the costs weighed against labor costs for comparable houses.

The agreement expressly related reasonableness of costs to "the type and mode of expenses normally and customarily incurred by a builder in residential construction." Gorfine's investigation was aimed at finding reasonable costs, so defined. Even true arbitrators have been held entitled to do as Gorfine did in making private independent checks by consulting price lists, examining materials, or receiving cost estimates to verify or supplement what they have been given by the parties. "* * * '[I]t is entirely proper for arbitrators, in a case requiring it, to obtain from disinterested persons of acknowledged skill such information and advice in reference to technical questions submitted to them, as may be necessary to enable them to come to correct conclusions, provided that the award is the result of their own judgment after obtaining such information.'" *Griffith Co. v. San Diego College for Women* (Cal.), 289 P. 2d 476, 479, and cases cited; Mechem, *Agency,* 2nd Ed., Sec. 310.

The picture that comes into clear and sharp focus from the

record is that Gorfine accurately interpreted the agreement under which he acted and carried out his duty faithfully and effectively, with entire impartiality and fairness.

Holtzman, who will have to pay over $70,000 for a house he expected to cost but $57,000, is naturally disappointed at the result of the submission, but we cannot find that he has any just cause for complaint in the way the submission was handled by Gorfine or in the result.

The posture of the case below, when the appeal was taken, requires comment. Admiral, Doccolo and his wife, and one Samuel Litman and his wife, filed a cross-bill to the Holtzmans' bill to set aside the award, alleging that after the rendition of the award by Gorfine, Admiral assigned the award to the Litmans and the Doccolos as security for moneys advanced by them to Admiral and asked that a money decree be entered in their favor jointly for $15,661.75, the amount of the award of the umpire. One Irvin Blumenfeld and his wife sought to intervene and have paid to them a judgment they had obtained against Admiral for some $5,000 and on which they had laid an attachment in the hands of the Holtzmans to be paid from the award.

Because he set aside the award, the chancellor did not pass upon the questions raised by the cross-bill and the intervenors. On the strength of the express agreement of the parties to that effect, and the case of *Parr Constr. Co. v. Pomer, supra,* 217 Md. 539, 544, and the authorities therein cited, we hold that the award was valid and finally binding on the Holtzmans, who owe $15,661.75 with interest from May 18, 1958—the agreement provided the award should be paid within ten days of its rendition; and we remand the case for determination as to whom the money is due.

*Decree reversed, with costs, and case remanded for further proceedings not inconsistent with this opinion.*