JOSEPHINE TRAMUTOLA AND FRED N. TRAMUTOLA, HER HUSBAND, PLAINTIFFS-RESPONDENTS, v. FRANK BORTONE, M.D., AND HAZEL OLGA ELWOOD AND JEROME J. ROSE, CO-EXECUTORS OF THE ESTATE OF BENJAMIN ELWOOD, DEFENDANTS-APPELLANTS, AND THE BERTHOLD S. POLLAK HOSPITAL FOR CHEST DISEASES, DEFENDANT.

Argued January 22, 1973—Decided May 7, 1973.

10

*Mr. Joseph T. Ryan* argued the cause for the defendants-appellants Hazel Olga Elwood and Jerome J. Rose, co-executors of the Estate of Benjamin Elwood (*Messrs. Lamb, Blake, Hutchinson & Dunne,* attorneys; *Mr. William J. Cleary, Jr.,* on the brief).

*Mr. Daniel K. Van Dorn* argued the cause for the defendant-appellant Dr. Frank Bortone (*Messrs. Gleeson, Hansen & Pantages,* attorneys).

*Mr. Morris Brown* argued the cause for the plaintiffs-respondents Josephine Tramutola and Fred N. Tramutola (*Messrs. Wilentz, Goldman & Spitzer,* attorneys; *Mr. Gene O'Donnell,* on the brief).

The opinion of the Court was delivered by

JACOBS, J. The Appellate Division affirmed the judgment of liability against the defendants Bortone and Elwood but modified the apportionment of damages. 118 *N. J. Super.* 503 (1972). Thereafter we granted a petition by Elwood for certification. 60 *N. J.* 513 (1972).

In 1959 the plaintiff Josephine Tramutola was being treated at the Bayonne Hospital for a kidney condition. While there chest x-rays were taken, disclosing a shadow over the right lung area. She was referred by her treating doctor to Dr. Benjamin Elwood whom she duly consulted. Dr. Elwood examined her and arranged for her admittance to the Pollak Hospital for further examination. Her condition was diagnosed as a bronchiectasis and she continued under Dr. Elwood's care and treatment. In due course Dr. Elwood consulted with Dr. Frank Bortone, Pollak's Chief Thoracic Surgeon, and then recommended to Mrs. Tramutola that she undergo an operation described as a lobectomy, to be performed by Dr. Bortone. She agreed and on April 28, 1960 Dr. Bortone performed a right middle lobectomy on her at Pollak Hospital. Dr. Elwood did not attend the operation. Post-operative x-rays were taken at the hospital and after Mrs. Tramutola was discharged she continued with visits at Dr. Elwood's office for post-operative treatment.

During her visits at Dr. Elwood's office she repeatedly complained of a sharp pain in her chest above the breast. Dr. Elwood took x-rays and fluoroscopes and told her that

the pain was muscular and would clear up. Her visits were first monthly and later semi-annually. Her last visit was in November 1964 and shortly before she was due for another visit in 1965 Dr. Elwood died. Her pain continued and in November 1965 she consulted Dr. Theodore Talbot, an internist in Staten Island. He took x-rays and informed her that there was a metallic object in her chest. Apparently a suturing needle used towards the close of the operation had broken off and part remained in her. Dr. Talbot conferred with Drs. Chamberlain and Rose and thereafter Mrs. Tramutola was admitted to St. Vincent's Hospital where a bronchoscopy was performed in an unsuccessful attempt to remove the needle. After further consultation, Dr. Talbot recommended that no surgical operation be performed to remove the needle since the risk would not be warranted. He advised Mrs. Tramutola to see him every six months so that he could determine whether there had been any movement in the location of the needle. He prescribed medication for her pain and, though the pain continues, no operative efforts to remove the needle are contemplated.

In 1966 Mrs. Tramutola, joined by her husband Fred N. Tramutola, filed her complaint in the Superior Court against Dr. Bortone, the Estate of Dr. Elwood and the Pollak Hospital, along with others not material here. She charged them with negligence resulting in her injury and sought compensatory damages. During the trial she testified extensively as to her medical history and her continuing pain. Dr. David Graubard, her medical expert, expressed the opinion that the needle was causing the pain. He testified, as noted by the Appellate Division (118 *N. J. Super.* at 510–511), that the x-rays taken at Pollak Hospital following the operation revealed that the front portion of a surgical needle used for suturing was located in the vicinity of the right bronchus in the hilar region, that the needle had become encapsulated by scar tissue, causing the surrounding tissue to become rigid, and that when Mrs. Tramutola made certain movements of her body, the rigid tissue

produced a pulling sensation on other organs in the area, causing pain. Dr. Lawrence I. Kaplan, a licensed physician specializing in psychiatry and neurology, also testified on Mrs. Tramutola's behalf. He was permitted, above objection, to state the medical history given to him. He expressed the opinion that she was suffering from "a chronic anxiety and depressive reaction, which is an emotional reaction and a mood disturbance related to the difficulties which she had following this operation, particularly to the knowledge, the awareness of a retained metallic fragment and the prospect, although not a certain one, of a potential surgical procedure in the future." See 118 *N. J. Super.* at 514.

The defense testimony consisted of a deposition by Dr. Talbot and oral trial testimony by Dr. Henry Reich. Dr. Talbot expressed the opinion that the area where the needle was imbedded was insensitive and that pain could not emanate from it; his view was that Mrs. Tramutola's pain was due to the lobectomy rather than the presence of the needle. 118 *N. J. Super.* at 510. Dr. Reich acknowledged that part of a surgical needle must have broken off during the operation and become buried in the hilar region; however, he testified that it had become encapsulated and would cause no pain. 118 *N. J. Super.* at 511. At the close of all the testimony and before summations the Pollak Hospital settled with the plaintiffs for $7,500. Without revealing the settlement, the trial judge submitted the cause to the jury which returned a verdict of $65,000 in favor of Mrs. Tramutola and $5,000 in favor of Mr. Tramutola, against all three defendants, namely, Dr. Bortone, Dr. Elwood's Estate and the Pollak Hospital. The trial judge apportioned the judgment in equal amounts, one-third payable by Dr. Bortone, one-third by Dr. Elwood's Estate, and the remaining third having been satisfied by the Pollak Hospital's settlement with the plaintiffs. 118 *N. J. Super.* at 518–519. Motions by Dr. Bortone and Dr. Elwood's Estate for a new trial were denied and thereafter they appealed to the Appellate Division.

In the Appellate Division Dr. Bortone did not question the jury's finding of liability, nor could he in the light of the undisputed evidence in the record. See *Sanzari v. Rosenfeld,* 34 *N. J.* 128, 140 (1961). No testimony on his part was introduced at the trial and his later attack was confined to the jury's finding of damages. The Appellate Division properly rejected this attack and the only item worthy of mention at this juncture relates to the ruling with respect to Dr. Kaplan's testimony. 118 *N. J. Super.* at 513–516. Mrs. Tramutola had preceded Dr. Kaplan on the witness stand and had testified with respect to her medical history and her current complaints. When his direct testimony began Dr. Kaplan explained that a neuro-psychiatric examination generally consists of "an appraisal of the patient's mental status and an evaluation of the various functions of the nervous system by certain tests." The appraisal "is made by interview chiefly" during which a history is obtained and during which the patient's responses to inquiries and his total attitude and demeanor are considered "pertinent to an evaluation of the patient's emotional or mental status." Dr. Kaplan interviewed Mrs. Tramutola and before giving his opinion as to her present mental and emotional condition he was allowed to state the history she gave him, not for the purpose of establishing the truth of her statement, but for the nonhearsay purpose of setting forth the matters on which the Doctor's opinion was based. See *People v. Brown,* 49 *Cal. 2d* 577, 320 *P. 2d* 5, 10–11 (1958); *Gentry v. Watkins-Carolina Trucking Company,* 249 *S. C.* 316, 154 *S. E. 2d* 112, 117 (1967); *cf. State v. Maik,* 60 *N. J.* 203, 208 (1972); *State v. McGill,* 101 *Ariz.* 320, 419 *P. 2d* 499, 500 (1966). Surely the trial court did not exceed its discretion in allowing the testimony for that purpose (*McCormick, Evidence* 692–94 (2d ed. 1972); VI *Wigmore, Evidence* § 1720 (3d ed. 1940); *Report of the New Jersey Supreme Court Committee on Evidence* 174–75 (1963)) and, in any event, there was no material prejudice since Mrs. Tramutola had herself given the same medical

history on the witness stand and was duly subjected to cross-examination. 118 *N. J. Super.* at 516.

The Appellate Division sustained the jury's finding not only as to Dr. Bortone but also as to the Elwood Estate. But Dr. Elwood's situation differed from Dr. Bortone's and was entitled to be dealt with independently. It is true that Dr. Elwood recommended Dr. Bortone but it is acknowledged that Dr. Bortone was reputable and competent and there was no negligence in the recommendation. Dr. Elwood did not participate at all in the operation and indeed was not present during it. He was not accountable for or chargeable with Dr. Bortone's negligence in connection with the handling of the suturing needle. Later, in his post-operative treatment of Mrs. Tramutola, Dr. Elwood was of course obliged to exercise due care and if, in the course of that treatment, he knew or had reason to believe that part of the needle had been left in her he was obliged to tell her, "absent any sound medical reason for not doing so." 118 *N. J. Super.* at 511–512. There was sufficient testimony from which the jury could determine that Dr. Elwood knew or had reason to believe that the needle was there and failed to tell Mrs. Tramutola and there was no testimony directed to any pertinent medical reason. Under the particular circumstances presented, the Estate could fairly be expected to come forward with evidence that there was sound reason for the failure to disclose if such was a defensive contention. 118 *N. J. Super.* at 512–513; *Annot.*, "Malpractice — Foreign Objects," 10 *A. L. R.* 3d 9, 37 (1966).

The Estate does advance two points of error which we consider to have merit. During the course of his charge, the trial judge instructed the jury as follows: "With respect to the liability of Dr. Elwood, it is the established law of this State that where two physicians are independently employed on the same case, they may, in the absence of instructions to the contrary, make such division of the services as in their best judgment [the] circumstances may require. Each

of the physicians so employed is answerable both for his own conduct and the negligent acts or omissions of the other which he permits without objection, or which, by the exercise of reasonable diligence, he should have observed." The jury might well have inferred from this quoted portion of the charge that Dr. Elwood could legally be held accountable for Dr. Bortone's negligence during the operative procedure. We have already expressed our view to the contrary. *Cf. Myers v. Holborn*, 58 *N. J. L.* 193 (*E. & A.* 1895); *Annot.*, "Liability of one physician or surgeon for malpractice of another," 85 *A. L. R. 2d* 889 (1962). In the course of his objections to the charge, counsel for the Estate specifically called the trial judge's attention to the fact that the charge "could lead the jury to believe that they could find Dr. Elwood responsible for leaving the needle in the chest area at the time of the operation." However, the trial judge erroneously permitted the charge to remain unaltered after the objections were completed.

In his charge on damages, the trial judge dealt with the matter as though any verdict by the jury against both Dr. Bortone and the Elwood Estate would necessarily be against them jointly in a single lump sum. There was a legal objection to the charge on damages and we consider that it was well taken. Dr. Bortone was liable for his negligent conduct during the operation and for all proximately consequential damages. However, Dr. Elwood was not liable for occurrences during the operation; his liability, if any, was for damages proximately consequential on his own later conduct, namely, the failure, without sound medical reason, to tell Mrs. Tramutola about the needle after he first knew or had reason to believe that it was there. If perchance it was then too late to do anything about it without undue risk, then his failure to inform might well be viewed as having entailed no legally consequential damage, apart from any independent value which might be attached to the fact that she was denied the choice. The Appellate Division thought it implicit that if Mrs. Tramutola had been informed early

by Dr. Elwood she could have submitted to surgery which would have eliminated the pain. 118 *N. J. Super.* at 513. But there was no medical testimony whatever on the subject and we are not prepared on the record before us and without more to accept the Appellate Division's implication. We believe that the interests of justice will be better served by directing a new trial on the plaintiffs' claim against Dr. Elwood's Estate, both on liability and damages; this will not at all impair the verdict by the jury against Dr. Bortone.

In his apportionment of damages the trial judge dealt with the Pollak Hospital as a joint tortfeasor whose liability, were it not for the settlement, would have been coextensive in amount with that of Dr. Bortone. He pointed out that the Pollak Hospital is not a separate corporate entity but was created and is operated by the County of Hudson. He concluded that the $10,000 limitation of liability in *N. J. S. A.* 2A:53A–8, expressely applicable to non-profit corporations "organized exclusively for hospital purposes," is not applicable to a claim against a municipal corporation for damages resulting from its improper operation of its hospital. Though the Appellate Division differed with this conclusion (118 *N. J. Super.* at 519), we are in agreement with the trial judge. The subject was recently discussed in comprehensive fashion by Judge Lynch in his dissent to *Winters v. City of Jersey City,* 120 *N. J. Super.* 129, 135 (App. Div. 1972). Since we have this day decided *Winters* and have expressly adopted his dissenting views, we need not deal further with the issue here. *Winters v. City of Jersey City,* 63 *N. J.* 7 (1973).

In the light of all of the foregoing, we may now sum up on the matter of apportionment. If the plaintiffs are unsuccessful in the prosecution of their claim against Dr. Elwood's Estate, the $70,000 judgment would be payable as follows: one-half ($35,000) payable by Dr. Bortone, with the remainder having been satisfied by the Pollak Hospital's settlement and its payment thereunder; if the plaintiffs

choose not to prosecute their claim against Dr. Elwood's Estate then the same result would follow, without prejudice however to Dr. Bortone's right to assert a contribution claim against Dr. Elwood's Estate if he considers that he is in a position to establish it. However, if the plaintiffs are successful in the prosecution of their claim against Dr. Elwood's Estate then their recovery against the Estate, which presumably would be in a sum less than the $70,000 judgment, would be apportioned three ways, one-third payable by Dr. Bortone, one-third payable by Dr. Elwood's Estate and one-third having been satisfied by the settlement. The excess above their recovery up to the $70,000 judgment would, as aforestated, be payable to the extent of one-half by Dr. Bortone. See, generally, *N. J. S. A.* 2A:53A–1 *et seq.; Young v. Steinberg, et al.,* 53 *N. J.* 252 (1969); *Tino v. Stout,* 49 *N. J.* 289 (1967); *Theobold v. Angelos,* 44 *N. J.* 228 (1965).

The judgment against Dr. Bortone is modified and Affirmed as modified, the judgment against Dr. Elwood's Estate is Reversed, and the matter is Remanded for apportionment or further proceedings in accordance with this opinion.

*For modification and affirmance as to Bortone, and reversal as to Elwood* — Chief Justice WEINTRAUB, Justices JACOBS, HALL, MOUNTAIN and SULLIVAN, and Judges CONFORD and LEWIS—7.

*Opposed*—None.