BERNARD LEVINE, PLAINTIFF-RESPONDENT, v. WISS & CO. AND HERBERT RUDNICK, DEFENDANTS-APPELLANTS.

Argued January 23, 1984—Decided July 31, 1984.

*Todd M. Sahner* argued the cause for appellants (*Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney,* attorneys; *Todd M. Sahner* and *Albert G. Besser,* on the briefs).

*Robert S. Field* argued the cause for respondent (*Fish, Field & Greenspoon,* attorneys).

The opinion of the court was delivered by

HANDLER, J.

This case raises the question of whether an accountant, selected by the litigants in a contested matrimonial case and appointed by the court to act as an "impartial expert" in rendering a binding valuation of a business asset for purposes of equitable distribution, should be held liable for negligence in deviating from accepted standards applicable to the accounting profession.

I

The parties are in agreement as to the relevant facts. Grace Levine, upon filing for divorce from Bernard Levine, moved that an impartial expert be appointed by the court to evaluate her husband's interest in Unified Components Corporation/Unicorp (Unicorp), in anticipation of an equitable distribution. Both parties agreed to this procedure and consented to an order that provided in relevant part:

3. That the parties direct their respective attorney [*sic*] to engage an impartial accountant, acceptable to both, to examine the books and records of defendant Unicorp, and value said corporation.

4. That the impartial expert so selected shall make a report of his findings which shall be binding and conclusive on both parties.

The parties engaged defendant Wiss & Company (Wiss), an accounting firm, to undertake the evaluation. In April 1977 Herbert Rudnick, one of the firm's partners and a named

defendant, reviewed Unicorp's records and submitted a report to the court on behalf of Wiss, estimating the Levines' equity interest in Unicorp and reporting the company's cash-basis income for the four previous years.

Before trial, the Levines reached a settlement with respect to equitable distribution, alimony and child support. In February 1979, however, the parties moved jointly to vacate the settlement. The trial court denied this motion, and a judgment of divorce incorporating the property settlement was entered on April 9, 1979. Mr. Levine appealed the denial of the motion, requesting also that the consent order providing for defendants' appointment be vacated and that the matter be remanded for a plenary hearing on the issues of equitable distribution and support. In December 1980, in a *per curiam* opinion, the Appellate Division affirmed the judgment of the lower court, upholding the settlement agreement. 190 *N.J.Super.* 335 (1983).

In March 1982 Mr. Levine brought the instant action against Wiss and Rudnick, alleging negligence in their valuation of Unicorp, breach of agreement, and breach of fiduciary duty. The consequent damage asserted was part of the sum paid to Mrs. Levine pursuant to the terms of the settlement. Plaintiff claimed that he was forced to accept an unfavorable settlement because of the allegedly incorrect values furnished by defendants.

On defendants' motion, the trial court dismissed the complaint for failure to state a claim upon which relief could be granted. The court, relying substantially on English common-law precedent, held that an accountant appointed pursuant to court order enjoys "limited immunity" from suit and will be liable only if he or she acts in bad faith. The Appellate Division reversed, concluding that defendants' role was comparable to that of any expert hired by parties to a contract to resolve a dispute over a particular term's meaning, and therefore that defendants were not shielded from potential liability. 190 *N.J.*

*Super.* 335. We granted defendants' petition for certification, 94 *N.J.* 613 (1983). For the reasons expressed in this opinion, we affirm the judgment of the Appellate Division.

## II

One who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities. *Restatement (Second) of Torts* § 299A (1965). We have held that deviation from the accepted standards of care governing the professional conduct of, for example, doctors, *Tramutola v. Bortone,* 118 *N.J.Super.* 503 (App.Div.1972), modified on other grounds, 63 *N.J.* 9 (1973), dentists, *Sanzari v. Rosenfeld,* 34 *N.J.* 128 (1961), chiropractors, *Klimko v. Rose,* 84 *N.J.* 496 (1980), pharmacists, *In re Suspension of Heller,* 73 *N.J.* 292 (1977), lawyers, *St. Pius X House of Retreats v. Camden Diocese,* 88 *N.J.* 571 (1982), and insurance brokers, *Milliken v. Woodward,* 64 *N.J.L.* 444 (Sup.Ct.1900), will result in liability for negligence. Significantly, we have expressly recognized, and recently stressed, that an accountant may be held responsible to those to whom a duty is owed, for failure to adhere to the standards of the profession. *See Rosenblum v. Adler,* 93 *N.J.* 324 (1983).

"Accounting is the act of identifying, measuring, recording and communicating financial information about an economic unit." *Id.* at 342, citing *W. Pyle and J. White, Fundamental Accounting Principles* 1 (1972). An accountant must exercise reasonable care in preparing reports, verifying underlying data, and examining the methods employed in arriving at financial statements. An incorrect financial statement, negligently prepared by an accountant and justifiably relied upon, "may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance." *Id.* at 334. We have recognized that the public interest to be served by the rule holding accountants responsible for negligence is sufficiently

compelling to warrant extension of the duty of care not only to those with whom the accountant is in privity, but also to those third persons known and intended to be the recipients of the representations, as well as those who foreseeably might rely on those representations. *Id.* at 352.

In the instant case, defendants were engaged as accountants to value plaintiff's business interest in accordance with the professional standards governing accountancy. This would call for application of general principles of accountancy in examination of the company's financial statements and records, critical review of supporting documents, and consideration of the underlying accounting methodology used in the business. *Commission on Auditor's Responsibilities, American Institute of Certified Public Accountants, Report, Conclusions and Recommendations* 1, 45 (1978). This standard of care, and the general rule of professional responsibility and liability for negligence, are implicated in plaintiff's complaint.

Defendants contend that they are not liable for any negligence in the performance of their professional duties on behalf of the parties. They stress that they were court-appointed, and that the litigants agreed that the valuation would be binding. These factors, defendants argue, elevated them beyond the status of accountants to the quasi-judicial role of "arbitrators," who would generally be shielded from private actions for damages brought by the parties to a given dispute.

Plaintiff maintains that defendants were engaged and appointed as accountants, and, consequently, they were expected to employ customary professional skill in the accomplishment of their designated task. As accountants, plaintiff asserts, defendants are more fittingly analogized to experts such as "appraisers" or "valuers," as opposed to arbitrators. The appraiser or valuer, unlike the arbitrator, is an expert or technician retained to apply professional or specialized knowledge and skill in the determination of "specific issues of actual cash value." 5 *Am.Jur.*2d "Arbitration & Award" § 3 (1962).

In this case, defendants were expected to apply their professional accountancy skills to determine the valuation of Unicorp. *See Bewick v. Mecham*, 26 *Cal.*2d 92, 156 *P.*2d 757 (1945); *Litman v. Holtzman*, 219 *Md.* 353, 149 *A.*2d 385 (1959); *In re Delmar Box Co.*, 309 *N.Y.* 60, 127 *N.E.*2d 808 (1955). They can appropriately be considered "appraisers," applying principles of accountancy in making their determination. Consequently, the standards of reasonable care applied to lawyers, doctors, engineers, and other professionals charged with furnishing skilled services for compensation attach with equal force and justification to defendants here. *Gammel v. Ernst & Ernst*, 245 *Minn.* 249, 72 *N.W.*2d 364 (1955). Under this standard of duty, defendants are required "to perform the services for which they were engaged in good faith and with reasonable care and competence, and [are] liable for damages occasioned by any failure to do so." *Id.* at 254, 72 *N.W.*2d at 367.

We have recognized the distinction between a person engaged because of special knowledge, technical skill, or expertise to act as an "appraiser" in a dispute, as opposed to one appointed to serve in a quasi-judicial capacity as an "arbitrator," in whose hands "the dispute resolution process is entrusted." *Barcon Assocs. v. Tri-County Asphalt Corp.*, 86 *N.J.* 179, 188 (1981). The appraiser is expected to perform a discrete function involving only the ascertainment of particular facts. This function, which entails neither a hearing nor the exercise of judicial discretion, is not to be confused with the duty of the arbitrator. *Elberon Bathing Co. v. Ambassador Ins. Co.*, 77 *N.J.* 1, 16–17 (1978) (agreement for arbitration ordinarily encompasses disposition of entire controversy between the parties upon which award or judgment may be entered; on the other hand, agreement for appraisal extends merely to resolution of specific issues of actual cash value with all other issues reserved for determination in plenary action before court); *Lakewood Tp. Mun. Util. v. South Lakewood Water Co.*, 129 *N.J.Super.* 462, 471 (App.Div.1974) (when parties to a contract

provide for method of ascertaining cash value of item related to negotiations, provision is one for an appraisement, and not for an arbitration); *see also E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas*, 551 *F.*2d 1026, 1033 (5th Cir.1977), *cert.* den., 434 *U.S.* 1067, 98 *S.Ct.* 1246, 55 *L.Ed.*2d 769 (1978); *Sanitary Farm Dairies, Inc. v. Gammel*, 195 *F.*2d 106 (8th Cir.1952).

Although, as recognized by the dissent, arbitration can proceed informally, arbitrators typically act in an adjudicatory mode. They may receive the evidence of witnesses or the views of a party to a dispute only in the presence of, or on notice to, all parties, and may adjudge the matters to be resolved only on what is presented in the course of an adversary proceeding. *Barcon Assocs. v. Tri-County Asphalt Corp., supra*, 86 *N.J.* 179; *Carpenter v. Bloomer*, 54 *N.J.Super.* 157 (App.Div.1959). By contrast, "the skill, knowledge, and experience of the valuer are substituted for the taking of evidence· and hearing of argument, and the appraisal becomes only a link in the chain of evidence and not a final settlement of the dispute." Note, "Arbitration or Appraisement?," 8 *Syracuse L.Rev.* 205, 206 (1957).

> Arbitration is conducted as a quasi-judicial proceeding, with hearings, notice of hearings, oaths of arbitrators and oaths of witnesses. Appraisers act only on their own [discretion] * * * [and] need not be sworn and need hold no formal hearings so long as both sides are given an opportunity to state their positions. [*Elberon Bathing Co. v. Ambassador Ins. Co., supra*, 77 *N.J.* at 17.]

An arbitrator "must render a faithful, honest and disinterested opinion upon the testimony submitted to him." *Brotherton, Inc. v. Kreielsheimer*, 8 *N.J.* 66, 70 (1951); *see also Barcon Assocs. v. Tri-County Asphalt Corp., supra*, 86 *N.J.* at 192 (every arbitrator, neutral or party-designated, must make full disclosure of possible conflicts of interest to parties, prior to commencement of arbitration proceedings); *American Eagle Fire Ins. Co. v. New Jersey Ins. Co.*, 240 *N.Y.* 398, 405, 148 *N.E.* 562, 564 (1925) ("[An arbitrator] should sedulously refrain from any conduct which might justify even the inference that either party is the special recipient of his solicitude or favor.")

These principles are incorporated in our arbitration act, *N.J. S.A.* 2A:24–1 to –11, which grants arbitrators "extremely broad powers and extends judicial support to the arbitration process subject only to limited review." *Barcon Assocs. v. Tri-County Asphalt Corp., supra,* 86 *N.J.* at 187. "[A]rbitrators decide both the facts and the law," *Daly v. Komline-Sanderson Engineering Corp.,* 40 *N.J.* 175, 178 (1963), and the dispositions reached by arbitrators are afforded collateral estoppel effect by reviewing courts. *Ukrainian Nat'l Urban Renewal Corp. v. Joseph L. Muscarelle, Inc.,* 151 *N.J.Super.* 386, 398 (App.Div. 1977), certif. den., 75 *N.J.* 529 (1977). In some circumstances the arbiter's determination can acquire the hue of judicial decisions, in terms of its legal effect in independent judicial proceedings. *Thornton v. Potamkin Chevrolet,* 94 *N.J.* 1 (1983).

Because they frequently proceed quasi-judicially, arbitrators are generally afforded an immunity from liability for the consequences of their decisions or awards that is comparable to that accorded judges. *Craviolini v. Scholer & Fuller Associated Architects,* 89 *Ariz.* 24, 357 *P.*2d 611 (1961); *Gammel v. Ernst & Ernst, supra,* 245 *Minn.* 249, 72 *N.W.*2d 364; *see* 5 *Am.Jur.* 2d "Arbitration and Award," *supra,* § 107. There is much to recommend this rule, as it supports a strong public policy favoring arbitration. *See Barcon Assocs. v. Tri-County Asphalt Corp., supra,* 86 *N.J.* at 210 (Clifford, J., dissenting) ("[T]he paramount public policy consideration of reviewing courts [is] the promotion and encouragement of voluntary arbitration as a means of resolving commercial disputes informally, expeditiously, relatively inexpensively, and in a manner that relieves our overburdened judicial resources."); *Hudik-Ross, Inc. v. 1530 Palisade Ave. Corp.,* 131 *N.J.Super.* 159, 166 (App.Div.1974); *Carpenter v. Bloomer, supra,* 54 *N.J.Super.* 157, 162. The grant of immunity serves to preserve the arbitrator's integrity and independence, and to ensure that arbiters will act upon their convictions, free from the apprehension of adverse consequences. The scope of such an immunity in this

context should be only coextensive with the purposes of arbitration and its most central role as an important substitution "of another tribunal for the tribunal provided by the ordinary processes of law," *Barcon Assocs. v. Tri-County Asphalt Corp., supra,* 86 *N.J.* at 187 with its goal of providing for "the final disposition * * * of the controversial differences between the parties." *Eastern Engineering Co. v. City of Ocean City,* 11 *N.J.Misc.* 508, 510 (Sup.Ct.1933). Accordingly, the immunity should be extended no further than is needed to advance these purposes and underlying policies. Consequently, it should not be available to shield from liability for negligence appraisers or other experts performing limited functions, as part of their regular professional responsibilities, in the context of judicial proceedings. *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas, supra,* 551 *F.*2d at 1033. To do so would not only stretch beyond social need and utility the policy that encourages arbitration, but would also create an additional legal immunity—a consequence contrary to our prevailing philosophy and practice that strive to provide redress for wrongful injury. *See, e.g., Kelly v. Gwinnell,* 96 *N.J.* 538 (1984).

The defendants before us—experts retained by the parties to a dispute to perform a valuation in accordance with recognized principles of accountancy—did not remotely resemble arbitrators when they performed their assigned function, and, accordingly, they are not entitled to immunity from legal responsibility for any malfeasance. *See Elberon Bathing Co. v. Ambassador Ins. Co., supra,* 77 *N.J.* at 17; 6A *A. Corbin, Contracts* § 1442 (1962 & Supp.1982). Defendants simply rendered a singular determination—a finding of fact by which the parties had agreed to be bound. They did not resolve any conflicting claims or determine legal rights and obligations. They did not exercise the discretionary judgment that is the hallmark of the arbitrator's function. In short, in discharging their very discrete and limited duties, defendants were not acting quasi-judicially. Since they bore little, if any, resemblance to judicial

officers, the very rationale that would warrant a grant of immunity is absent.

Contrary to the finding of the trial court, there is no special significance to be attached to the fact that defendants were appointed by the parties pursuant to court order. As succinctly stated by the Appellate Division:

> The fact remains that defendants were selected by the parties to a lawsuit to perform a valuation that the parties agreed would be binding. The trial judge's entry of a consent order embodying the parties' settlement did not alter the private and consensual nature of that settlement, and did not endow defendants with a judicial immunity that would have been absent without the consent order. Rather, defendants' role was indistinguishable from that of the experts often retained by the parties to a private contract to fix a term upon which they cannot agree or have not the expertise to determine. It is in this role that we evaluate defendants' exposure to suit. [190 *N.J.Super.* at 338.]

A court-appointment is not a talisman for immunity. It does not alter the critical fact that defendants engaged in no adjudication and exercised no quasi-judicial power. Rather, they acted as "creatures of contract," *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas, supra,* 551 *F.*2d at 1033, retained by the parties to perform a specific duty. That duty was to apply established accounting principles to the financial facts as they found them. *See Rosenblum v. Adler, supra,* 93 *N.J.* at 342. The submitted finding bound the parties only because they had made a specific private decision to be bound.

We find ourselves in full accord with the decision of *Gammel v. Ernst & Ernst, supra,* 245 *Minn.* 249, 72 *N.W.*2d 364. There the Minnesota Supreme Court held that an accountant hired to audit a corporation, pursuant to the terms of a binding agreement entered into by the parties to a planned merger, was not a quasi-arbitrator entitled to immunity from suit for his negligence. The court found that the accountant could be sued for negligence in assessing the per-share earnings of the company's stock. Alluding to the policies justifying immunity, the court rejected the claim, raised here as well, that because the parties had agreed to be bound by the value, the valuer had acted as an arbitrator and was immune from liability. *Id.* 72 *N.W.*2d at

367–68. Rather, the court placed the defendant experts in the category with other professionals who furnish skilled services for compensation. As such, they were outside the narrow grant of judicial immunity. "Where the agreement does not call for the exercise of judicial authority, ordinarily the person selected to perform skilled or professional services is not immune from charges of negligence." *Id.* at 368; *see also* Annot., "Accountant's Malpractice Liability to Client," 92 *A.L.R.*3d 396, 409 (1979).

This reasoning applies with equal cogency to the facts now before us. "An accountant in defendants' position does not exercise judicial authority." 190 *N.J.Super.* at 339. Accordingly, we find unpersuasive, as did the Minnesota Supreme Court, the two early English cases relied on by the trial court here in granting defendants' motion for summary judgment, *Pappa v. Rose,* 7 *L.R.–C.P.* 32 (1871), 7 *L.R.–C.P.* 525 (1872); *Finnegan v. Allen,* [1943] 1 *K.B.* 425.[1]

---

[1]These English precedents extended to valuers the immunity generally reserved to arbitrators. In *Pappa v. Rose, supra,* 7 *L.R.–C.P.* 32, a broker, pursuant to contract, agreed to sell raisins for a producer. In a subsequent contract between the broker and a buyer, the broker agreed to certify the quality of those raisins. Upon finding the goods substandard, the broker subsequently refused to attest to their quality, and the buyer, in turn, refused to perform. The producer then sued the broker, claiming that he was negligent in his assessment of the raisins' quality. The court held that the broker could not be sued. As with a submission to an arbiter, the parties had agreed to be bound by the broker's determination and, accordingly, had to bear the risk of a negligent assessment. However, the court hastened to add that the broker had made no claim of expertise as an assessor of raisins—he had held himself out only as a *broker.* Inferentially, the function he performed was more analogous to an arbiter than a valuer. The instant case is therefore distinguishable, insofar as defendants held themselves out as accountants and, in fact, performed as accountants.

*Finnegan v. Allen, supra,* [1943] 1 *K.B.* 425, succeeded *Pappa v. Rose* and broadened its predecessor's rule, according a "valuer" immunity for negligence. There, the parties to a contract had agreed to submit the stock of a closely held company to defendant for valuation. Noting that its holding was aimed at protecting a valuer from suit by the inevitable dissatisfied party, the court ruled that, absent a showing of bad faith, plaintiff could not sue

## III

For the reasons set forth in this opinion, we affirm the judgment of the Appellate Division.

O'HERN, J., dissenting.

The majority has encouraged three lawsuits where one would have sufficed.[1] Such a result runs counter to every statement this Court makes on the need to find methods to resolve disputes other than through litigation. *See, e.g., Faherty v. Faherty,* 97 *N.J.* 99, 105 (1984) ("In this state, * * * arbitration is a favored remedy.") The diversion of cases from the usual trial pattern "to alternative programs of dispute resolution has come to be viewed as an effective means to dispense justice quickly and efficiently while easing the ever-increasing burden on limited court resources." *Supreme Court Committee on Complementary Dispute Resolution Programs (Burlington County Project), Final Report* 1 (March 23, 1984).

Central to such alternatives is encouraging parties to resolve their own differences. In this case the parties did exactly that. They agreed in writing that the accountant selected by their attorneys "shall make a report of his findings which shall be binding and conclusive on both parties." This voluntary settlement should have ended this aspect of the dispute between the parties. We have caused a rerun of the controversy by permitting the accountant's judgment to be the subject of another lawsuit.

---

defendant for want of care and skill in rendering the valuation. The court, however, distinguished the valuer from the arbitrator; unlike the arbitrator, the valuer could be sued for failure to follow instruction.

[1] At oral argument, it was conceded that just as the husband may make a claim of negligence on the part of the accountant in evaluating the stocks that were to be assigned to the wife, so too the disgruntled wife may have a cause of action against the accountant. The wife and husband had *jointly* sought to vacate the settlement.

How can we explain the judicial resistance, exemplified by the majority, to accepting an accountant as the arbitrator of the parties' case? The parties have quite plainly chosen another to resolve their dispute. The decisions of that third party, especially one selected in the context of a judicial proceeding, should not be challenged in a new lawsuit.

Chief Justice Burger traced the historic reluctance of courts to support arbitration to the ancient antipathy of equity against specific performance of arbitration agreements:

> The need for the law [the Federal Arbitration Act] arises from ... the jealousy of the English courts for their own jurisdiction.... This jealousy survived for so lon[g] a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. [*Southland Corp. v. Keating,* — *U.S.* —, —, 104 *S.Ct.* 852, 859, 79 *L.Ed.*2d 1, 13–14 (1984) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess. 1–2 (1924)).]

It is mindless jealousy today, no longer rooted in reality. At least our common-law predecessors had sensible reasons for opposing arbitration—they wanted to collect the fees for their court: "[T]he main purposes of the King's justice were political and financial, in consolidating and unifying the kingdom and in bringing fees into the royal treasury." Sayre, "Development of Commercial Arbitration Law," 37 *Yale L.J.* 595, 598 (1928). One of the goals of a modern system of justice should be to avoid causing separate trials to exist where one trial would suffice.

We need not cite outside critics to assess the status of the justice system in New Jersey. Our Committee on Civil Case Management and Procedures (Schreiber Committee) sees "the rising tide of litigation, increases in the time and costs required for disputes to be resolved, and the growing public perception of our justice system as cumbersome and inefficient, meting out frustration and delay rather than fairness," as calling for change. "Simply stated," it continues, "any revamping of our present system must have a single goal: to scale down the extensive nature of litigation so that a fair disposition can be obtained expeditiously and inexpensively." *Toward a Theory of Civil Case Management* 25–26 (June 1984). What could be

more expeditious and inexpensive than having these two parties resolve a dispute over the valuation of stock through the judgment of an accountant?

If we are truly serious about developing desirable alternatives to litigation, our guiding principle should be strengthening the systems that encourage that end, not weakening them. I believe it weakens such systems to look for fine distinctions that make the dispute-resolver subject to lawsuits by disgruntled participants. Judges do not permit themselves to be so sued. *Bradley v. Fisher*, 80 *U.S.* (13 *Wall.*) 335, 20 *L.Ed.* 646 (1872). We should not permit other dispute-resolvers to be sued.[2]

The majority makes a point of saying that the accountant did not perform the role of an arbitrator because "arbitrators typically act in an adjudicatory mode. They may receive the evidence of witnesses or the views of a party to a dispute only in the presence of, or on notice to, all parties, and may adjudge the matters to be resolved only on what is presented in the course of an adversary proceeding." *Ante* at 249.

There is nothing in the law that requires that every dispute between parties be resolved in a trial-type hearing before it is

---

[2]In this regard, it is ironic that if the court had simply had the accountant appointed as an independent expert to aid the court under Rule 5:3–3 there would be little doubt in my mind that the testimony and report would be privileged. *See Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 *N.J.* 552, 559–60 (1955) (statements made in judicial proceeding absolutely privileged). True, the accountant would be subject to cross-examination, but here the parties agreed to waive that right by letting him make the report outside of the courtroom.

The majority's opinion also casts doubt on what I·would otherwise have considered the judicial immunity of special masters appointed under *Southern Burlington Cty. NAACP v. Township of Mount Laurel*, 92 *N.J.* 158 (1983). Considering the authority of those masters—"limited to rendering opinions, proposing findings, issuing recommendations, and assisting the court in other similar ways as it may direct," *id.* at 284—I doubt whether they could withstand the analysis the majority employs in this case.

considered an arbitration. After all, arbitration has only three principal characteristics:

> (1) It is the *voluntary* reference of a dispute by the parties to (2) an arbitrator or arbitrators *chosen* by the parties who (3) agree the decision will be final and *binding.* [A. Simpson, Jr., *Whither Judicial Arbitration in New Jersey* 12 (March 9, 1982) (unpublished manuscript available at State Library) (emphasis in original).] [3]

In *Barcon Assocs., Inc. v. Tri-County Asphalt Corp.,* 86 *N.J.* 179 (1981), we said:

> Arbitration is "a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law," and its object is "the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties." [*Id.* at 187 (quoting *Eastern Eng'g Co. v. City of Ocean City,* 11 *N.J.Misc.* 508, 510–11 (Sup.Ct.1933)).]

*N.J.S.A.* 2A:24–2, part of our Arbitration Act, is not confining. It provides simply: "2 or more persons by their agreement in writing may submit to arbitration a controversy existing between them at the time of the agreement * * *." Moreover, the statute is not the preemptive source of the power of parties to enter into a submission of a dispute as at common law. *See Hoboken Mfrs. R.R. Co. v. Hoboken R.R. Warehouse & S.S. Connecting Co.,* 132 *N.J.Eq.* 111, 116–17 (Ch. 1942), aff'd, 133 *N.J.Eq.* 270 (E. & A. 1943).

Of course parties can agree to follow the procedures established by the American Arbitration Association, which contain the usual trial format, or they can agree to any other kind of procedure to be used in resolving the dispute. *See Scherk v.*

---

[3] Judge Simpson traced the history of arbitration from antiquity to modern times:

> Another definition of arbitration, by a man who considers it art rather than science, follows:

> "Arbitration is a simple, uncomplicated system, created through need by trial and error, whereby mankind has settled and does settle disputes of every kind or nature through the acceptance of the judgment of one or more reasonable and competent honorable men as the final settlement of the dispute." [Simpson, *supra,* at 9–10 (quoting Gotshal, "The Art of Arbitration," 48 *A.B.A.J.* 553 (1962)).]

*Alberto-Culver Co.*, 417 *U.S.* 506, 94 *S.Ct.* 2449, 41 *L.Ed.*2d 270, (1974); *see also* Note, "Labor Arbitration in New Jersey," 14 *Rutgers L.Rev.* 143, 172 (1959).

We should not confine arbitral immunity to strictly structured formats. These parties agreed to submit their dispute to resolution by a third party. Courts should remain open to more loosely structured methods that will evolve to meet the needs of society: "Courts set the patterns and define the parameters of justice. They have a primary role to play, then, in developing new dispute resolution mechanisms." Jaffe & Stamato, *Dispute Resolution: Complementary Programs and the Courts* 13 (January 1983) (unpublished paper available from the Administrative Office of the Courts). We are shirking that primary role in this case, retreating to formalisms that suggest an underlying hostility to innovations in the judicial process. Our predecessors' hostility was at least motivated by self-interest in protecting the revenues of the crown courts.

The precedent cited by the majority for support of its decision is unpersuasive. The historical basis for the judicial distinction between appraisement and arbitration springs from a different source. Common-law courts in states that had legislative bans on arbitration of entire disputes developed the concept of appraisement as distinguished from arbitration to enable the parties to resolve their contractual disputes privately. *See School Dist. No. 1 of Silver Bow Cty. v. Globe & Republic Ins. Co.*, 146 *Mont.* 208, 404 *P.*2d 889, 892 (1965); *see also Polley's Lumber Co. v. United States*, 115 *F.*2d 751, 753 (9th Cir.1940) (contract provisions that do not purport to oust courts of jurisdiction are valid under Montana law; referral of determination of value to third person upheld). That distinction, made to advance the purpose of private ordering of disputes, is being turned on its head to hinder such ordering now. *Elberon Bathing Co., Inc. v. Ambassador Ins. Co., Inc.*, 77 *N.J.* 1 (1978), is actually consistent with such private ordering although it vacated the appraisers' award because of misconduct. As Judge Conford wrote there: "It is not in the public interest

to encourage litigation over procedures which were designed to resolve disputes without litigation." *Id.* at 14.

The majority relies on *Gammel v. Ernst & Ernst,* 245 *Minn.* 249, 72 *N.W.*2d 364 (1955), because that court makes the same distinctions as the majority. The Minnesota court described the defendant firm "not as an arbiter but as an accountant-evaluator." *Id.* at 256, 72 *N.W.*2d at 369 (quoting *Sanitary Farm Dairies, Inc. v. Gammel,* 195 *F.*2d 106, 115 (8th Cir.1952)). This merely states the result without explaining the difference. The absence of trial-like procedures should not dictate the result. The preoccupation of common-law courts with trial-like procedures stemmed from a unique historical perspective: courts had held that agreements to submit to arbitration were revocable; when statute law made the agreement to submit irrevocable, the courts insisted upon the procedures as a way of vindicating "the law of the land." Sayre, *supra,* 37 *Yale L.J.* at 612, 616.

The majority's distinction between an "appraiser" and an "arbitrator" is bottomed on a too simple idea of determining the "value" of a close corporation. The accountants cannot be considered arbitrators, the majority says, since they "simply rendered a singular determination—a finding of fact by which the parties had agreed to be bound." *Ante* at 251. That "finding of fact," however, is the end product of "an entirely different approach than the valuation of any other asset." *Lavene v. Lavene,* 162 *N.J.Super.* 187, 193 (Ch.Div.1978). Recently, we observed: "There are probably few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations." *Bowen v. Bowen,* 96 *N.J.* 36, 43 (1984) (quoting *Lavene v. Lavene,* 148 *N.J.Super.* 267, 275 (App.Div.), certif. denied, 75 *N.J.* 28 (1977)). More importantly, our cases have recognized that it is the judge's job to arrive at the values of assets for distribution. *See, e.g.; Bowen, supra,* 96 *N.J.* at 43; *Rothman v. Rothman,* 65 *N.J.* 219, 232 (1974); *Lavene, supra,* 148 *N.J.Super.* at 275. What judges must do—and what these defendants were hired to do—is more

than "identifying, measuring, recording and communicating." *Ante* at 246. This kind of valuation calls for weighing, comparing, and ultimately, judging. We should not be blinded by the defendants' professional title of "accountant" so that we fail to see what it is they actually did.

The pivotal question here is not what we call the defendants, nor even how they acted, but whether these parties agreed to a resolution of their dispute by the third person. *See Penn Cent. Corp. v. Consolidated Rail Corp.*, 82 *A.D.*2d 208, 441 *N.Y.S.*2d 266, 270, 271 (1981) (use of the word "appraisal" instead of "arbitration" is not controlling; the question is whether the third party's function is to resolve the very dispute between the parties). Thus a stipulation in a construction contract that an architect's certificate would be binding on the parties would immunize the architect's decision in the role of arbiter, but not immunize delay or failure to come to a decision. *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 *F.*2d 1026, 1033 (5th Cir.), modified, 559 *F.*2d 268 (1977), *cert.* denied *sub nom. Providence Hosp. v. Manhattan Constr. Co.*, 434 *U.S.* 1067, 98 *S.Ct.* 1246, 55 *L.Ed.*2d 769 (1978); *see also Tamari v. Conrad*, 552 *F.*2d 778 (7th Cir.1977) (arbitral immunity extends to cases in which arbitrator's authority to resolve dispute is challenged; individuals familiar with commodities future business serving as arbitrators at request of Chicago Board of Trade are immune); *Larry v. Penn Truck Aids, Inc.*, 567 *F.Supp.* 1410 (E.D.Pa. 1983) (member of special joint committee of labor and management created to resolve disputes clothed with immunity); *Wilder v. Crook*, 250 *Ala.* 424, 34 *So.*2d 832 (1948) (supervising engineer as arbiter of contract dispute enjoys immunity); *Craviolini v. Scholer & Fuller Associated Architects*, 89 *Ariz.* 24, 357 *P.*2d 611 (1961) (architects would enjoy immunity in role as arbiter but acts complained of were not in that capacity).

Of course this immunity can be lost for misconduct, *Baar v. Tigerman*, 140 *Cal.App.*3d 979, 189 *Cal.Rptr.* 834 (1983) (arbitrator not immune from claim for delay in decision), and the parties will be protected from misconduct. *Cf. Terminal*

*Constr. Corp. v. Bergen Cty. Hackensack River Sanitary Sewer Dist. Auth.,* 34 *N.J.Super.* 478, 504 (App.Div.1954) (engineer's certificate in construction contract is conclusive in absence of fraud or arbitrary action), modified, 18 *N.J.* 294 (1955); *see also Barcon Assos., Inc. v. Tri-County Asphalt Corp.,* 86 *N.J.* 179 (1981) (undisclosed affiliation with party taints judgment; every arbitrator must make full disclosure of party relationships). But no such allegations were made here and the accountant's value was accepted by the court.

These precedents establish that we should be focusing on function, not form. Employing the test of "functional comparability," the Sixth Circuit has concluded that in light of the encouragement of arbitration and the necessity for arbitrators to facilitate the policy, " 'it follows that the common law rule protecting arbitrators from suit ought not only be affirmed, but, if need be expanded.' " *International Union, United Automobile, Aerospace & Agric. Implement Workers v. Greyhound Lines, Inc.,* 701 *F.*2d 1181, 1186 (6th Cir.1983) (quoting *Hill v. ARO Corp.,* 263 *F.Supp.* 324, 326 (N.D.Ohio 1967)).

We are currently exploring unique proposals for methods of dispensing justice that will enable people to resolve their disputes fairly, efficiently, and swiftly. Their forms differ vastly, and include, as well, non-binding arbitration and mediation. A variety of legal disputes are amenable to such disposition, including neighborhood and family problems, minor criminal matters, and landlord-tenant disputes. Naturally, we will be able to shape the rules and procedures for the degree of formality and type of hearing that we want in any particular case: "As the alternative dispute resolution movement grows in New Jersey, the need to clearly define the legal issues of confidentiality, liability and enforceability becomes paramount." *Report of Municipal Court Programs Subcommittee of the Supreme Court Committee on Complementary Dispute Resolution Programs* 9 (March 14, 1981). The qualification and

training of mediators and arbitrators, especially in the fields of divorce and custody, are subjects that must be addressed as these programs expand. *See Report of the State Family Court Committee to the June 24, 1983 Judicial Conference* 47. Surely, no one would question that a CPA would have the requisite qualifications or training to serve these parties. I regretfully conclude that we have taken a step backward in this case by clouding the issues of liability of participants in such programs. Only recently, we said:

> It is fair and reasonable that parties who have agreed to be bound by arbitration in a formal, written separation agreement should be so bound. Rather than frowning on arbitration of alimony disputes, public policy supports it. We recognize that in many cases arbitration of matrimonial disputes may offer an effective alternative method of dispute resolution. As commentators have noted, the advantages of arbitration of domestic disputes include reduced court congestion, the opportunity for resolution of sensitive matters in a private and informal forum, reduction of the trauma and anxiety of marital litigation, minimization of the intense polarization of parties that often occurs, and the ability to choose the arbitrator. *See* Comment, 15 *Wake Forest L.Rev., supra,* at 490. In this sensitive and intensely private area of domestic disputes, arbitration expressly contracted for by the spouses is highly desirable. [*Faherty v. Faherty, supra,* 97 *N.J.* at 107 (1984).]

I am confident that the effects of this decision can be modified by rules created for court-annexed dispute programs. We should not insist that every such program be court-annexed, but should extend immunity to the "honorable men" or women chosen by the parties to make "the final settlement of the dispute." Gotshal, *supra* note 4.

I would reverse the judgment and hold the dispute-resolver immune.

*For affirmance*—Justices CLIFFORD, SCHREIBER, HANDLER and POLLOCK—4.

*For reversal*—Chief Justice WILENTZ, and Justices O'HERN and GARIBALDI—3.